# In the United States Court of Federal Claims

No. 22-1351
(Filed:  6 March 2023[*])

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MLINQS, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| DELOITTE CONSULTING LLP, | * |
| | * |
| Defendant-Intervenor. | * |
| | * |

Pre-Award Bid Protest; Post-Cancellation
Bid Protest; Motion for Judgment on the
Administrative Record; Bid Protest
Jurisdiction; Task Order; Motion to Strike;
Federal Acquisition Streamlining Act;
Rule of Two; *Blue & Gold*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Nathaniel Edward Castellano*, with whom were *Aimee Joo, David Robbins*, and *Moshe B. Broder*, Jenner & Block LLP, all of Washington, DC, for plaintiff mLINQS, LLC.

*Igor Helman*, Senior Trial Counsel, with whom were *Dan Bertoni*, Trial Counsel, *Elizabeth M. Hosford*, Assistant Director, *Patricia M. McMarthy*, Director, Commercial Litigation Branch, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, Department of Justice, *Nicholas T. Iliff, Jr.*, Trial Attorney, and *Ricarto Brazela*, Contracts Attorney, United States Air Force, all of Washington, DC, for defendant.

*Keith R. Szeliga*, with whom were *Adam Bartolanzo* and *Shaunna Bailey*, Sheppard Mullin Richter & Hampton LLP, all of Washington, DC, for defendant-intervenor Deloitte Consulting LLP.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiff mLINQS, LLC, a Service-Disabled Veteran Owned Small Business, brings this

---

[*] This Opinion and Order was originally filed under seal on 28 February 2023 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this Opinion and Order for any proprietary, confidential, or other protected information and submit proposed redactions by 6 March 2023.  The parties proposed no redactions, so the Court reissues the Opinion and Order, with a few minor, non-substantive corrections.

post-cancellation bid protest of procurements challenging the Air Force's final decisions of two separate-but-related procurements for the Air Force's Permanent Change of Station Modernization Program, which facilitates the assignment, detail, or transfer of an armed service member to a different duty station.  Plaintiff moves for judgment on the administrative record contending the government's decision to cancel the Request for Proposal was arbitrary and capricious.  Plaintiff also argues the Air Force's solicitation failed to satisfy both applicable small business set-aside rules (FAR 19.502) and market research and acquisition planning obligations (10 U.S.C. § 3453(c)(2); FAR 10.002(c); FAR 11.002(a)(2)).  Plaintiff seeks to restore the *status quo ante* before the Air Force cancelled the Request for Proposal solicitation and enjoin the Air Force from soliciting its Permanent Change of Station requirements without first complying with pertinent set-aside rules and obligations to prioritize existing commercial and non-developmental solutions.  Plaintiff argues the Air Force's resolicited task order award to defendant-intervenor, Deloitte Consulting LLP, is arbitrary and unlawful and necessitates remand with *vacatur*.  Deloitte Consulting LLP and the government move to dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims or, in the alternative, for judgment on the administrative record.  For the following reasons, the Court:  (1) denies plaintiff's motion for judgment on the administrative record; (2) denies defendant-intervenor's motion to dismiss; (3) denies the government's motion to dismiss; (4) grants the government's cross-motion for judgment on the administrative record; and (5) grants defendant-intervenor's cross-motion for judgment on the administrative record.

## I.     Factual Background

### A.     Military Permanent Change of Station Overview

Over 100,000 civilian employees and uniformed servicemembers of the United States Air Force move to new duty stations each year.  Admin. R. ("AR") at 526, ECF No. 42 at 526 (14 October 2021 Performance Work Statement—Task Order.  The Air Force ("the government" or "the agency")[1] currently provides support and reimbursement to travelers—totaling approximately $1 billion annually—through an "antiquated, inefficient, paper-based process."  AR at 1 (26 July 2018 Market Research Report—Sole Source), AR at 721 (5 August 2022 Air Force Industry Day Briefing Slides).  A Permanent Change of Station ("PCS") is the assignment, detail, or transfer of a member or unit to a different duty station under competent orders which neither specify the duty as temporary, nor provide for further assignment to a new station, nor direct return to the old station.  *See generally Schneiter v. United States*, 159 Fed. Cl. 356, 370–72 (2022) (describing the PCS process).  PCS involves "creating orders/obligations, advances, amendments, vouchers linked to orders, and Relocation Income Tax Allowance ('RITA') vouchers—all computed in accordance with the Joint Travel Regulations ('JTR')."  AR at 7 (2 August 2018 Limited Sources Justification and Approval—Sole Source); *see generally Schneiter*, 159 Fed. Cl. at 370–72.  The legacy PCS system requires "intensive manpower" to scan documents and requires coordination of five separate Air Force units.  AR at 1 (26 July 2018 Market Research Report—Sole Source).  The "manual processes and legacy systems that [the Air Force uses] for Permanent Change of Stations are failing and [Air Force] members need to be paid in a timely manner. . . . [and] with the old legacy systems, the [Air Force] is not able to accurately account for relocation expenditures nor efficiently manage its Permanent Change of

---

[1] The Court uses "the Air Force," "the government," and "the agency" interchangeably.

Station budget." AR at 7 (2 August 2018 Limited Sources Justification and Approval—Sole Source) (noting with the Air Force's current system, "old advances are often un-collected and many obligations stay on the books for months after they should be de-obligated").

**B.    30 August 2018 Sole Source Contract to mLINQS**

As early as 2016, the Air Force sought to simplify PCS accounting and payment system by obtaining a software system to automate and digitize the process of submitting, computing, and tracking PCS claims. *See* AR at 1 (7 (2 August 2018 Limited Sources Justification and Approval—Sole Source). Beginning 2 August 2016, the Air Force conducted 18 months of market research to find a PCS automation solution, including issuing requests for information, holding discussions with the government's subject-matter experts, and reviewing and evaluating relevant market information. AR at 1–5 (26 July 2018 Market Research Report—Sole Source), 9 (2 August 2018 Limited Sources Justification and Approval—Sole Source). Based on the research it conducted, the Air Force determined one vendor provided a commercially available and potentially suitable PCS software solution: mLINQS, LLC ("mLINQS"). AR at 2, 5 (26 July 2018 Market Research Report—Sole Source) ("These market research efforts have revealed that no other relocation system is either capable of performing the scope of this Permanent Change of Station automation requirement or has FedRAMP authorization, which is a mandatory security requirement."). mLINQS offered its PCS automation software product, called "moveLINQS," as Software as a Service ("SaaS"). AR at 2 (26 July 2018 Market Research Report—Sole Source), 978 (20 September 2022 Agency Decision—mLINQS Protest) ("The Air Force originally sought to fulfill its requirement for PCS Automation by procuring moveLINQS as . . . SaaS Commercial-off-the-shelf ('COTS')[2] solution . . . ."). Most of mLINQS's customers license moveLINQS through a SaaS model (typically referred to as COTS approach)—with each agency using the same software code. AR at 314 (RFI Industry Response Email—mLINQS).

On 30 August 2018, the Air Force issued solicitation No. FA701418R5041, and, on 12 September 2018, awarded contract No. FA701418F3145 to mLINQS as a sole-source contract for PCS automation. AR at 18 (30 August 2018 Solicitation—Sole Source), 88 (12 September 2018 Contract—Sole Source). The sole-source contract was for a one-year period of performance by mLINQS, with four year-long option periods. AR at 90–94 (12 September 2018 Contract—Sole Source). The contract's Performance Work Statement ("PWS") specified mLINQS's first task was to "function as a single focal point . . . for the configuration and testing" of its software "to determine if the product meets the needs" of the Air Force. AR at 112 (12 September 2018 Contract—Sole Source). The configuration and testing task required mLINQS to "[p]rovide solutions fully compliant with Federal statutes, regulatory accounting

---

[2] For an item to be designated as a COTS product, it must be "a product, other than real property, that is:

- of a type customarily used by the general public or by nongovernmental entities for purposes other than governmental purposes," and
- "sold in substantial quantities in the commercial marketplace;" and
- "offered to the [g]overnment, under a contract or subcontract at any tier, without modification, in the same form in which it is sold in the commercial marketplace;" and
- "does not include bulk cargo, . . . such as agricultural products and petroleum products."

*See* FAR 2.101.

standards, and other emerging requirements uncovered during this project." AR at 114 (12 September 2018 Contract—Sole Source). If configuration and testing of mLINQS's software was successful, mLINQS would continue to the contract's second task: providing PCS services for the Air Force. AR at 112 (12 September 2018 Contract—Sole Source).

For the next three years, the Air Force worked with mLINQS toward making mLINQS's commercial PCS automation software functional for the Air Force. AR at 127–43 (2018 to 2021 Contractor Performance Assessment Reports—mLINQS). On 30 June 2021, however, the Air Force notified mLINQS it would "not exercise Option Year 3." AR at 882 (Air Force Memorandum for mLINQS "SUBJECT: Notice of the Government's Intent Not to Exercise Option Year 3"). The Air Force's annual assessments of mLINQS's performance in contract years 2018, 2019, and 2020 documented the moveLINQS software was not fulfilling the Air Force's needs. *See* AR at 127–43 (2018 to 2021 Contractor Performance Assessment Reports—mLINQS). Specifically, the contracting officer ("CO") highlighted mLINQS's continued failure to provide a self-vouchering feature and reiterated mLINQS's "hot fixes and minor adjustments to existing functionality" did not solve the problem. AR at 137 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS) (observing "while the [mLINQS] system works as is for Federal Agencies, it cannot accommodate [the] Air Force's volume and does not include the functionality that would provide an adequate replacement in its current state for the other systems currently in use by [the] Air Force"). Additionally, the 2021 to 2022 evaluation noted mLINQS lacked a Standard Financial Information Structure ("SFIS")-compliant accounting screen. AR at 138 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS). mLINQS acknowledged its software did "not completely meet [the Air Force's] operational needs yet." AR at 139 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS) (noting "the original intent of the contract was to explore if mLINQS System could meet [Air Force's] requirements and, most likely, there would be enhancements necessary to fully meet [Air Force's] operational requirements.").

**C.    9 August 2021 Rule of Two Analysis and 14 October 2021 RFP Solicitation**

On 29 June 2021, the Air Force initiated market research regarding a different PCS automation solution through a request for information ("RFI") posted on SAM.gov. AR at 156–62 (29 June 2021 SAM.gov Posting—RFI). The draft performance work statement for the request again sought to "automate the end-to-end process for civilian and uniformed PCS Orders and Vouchers." AR at 165 (9 June 2021 PWS). The Air Force made clear the required "Functional Capabilities" included "a self-vouchering tool that allows travelers to submit actual (realized) travel data and input all necessary allowance claims" and "[a]ll transactions and accounting screens shall comply with the Standard Financial Information Structure ('SFIS') . . . format/layout." AR at 169 (9 June 2021 PWS).

Thirteen vendors responded to the Air Force request for information, from both large and small businesses, including one from mLINQS and one from an accounting firm, Kearney & Co ("Kearney"). AR at 191 (20 July 2021 Email regarding RFI responses); *see* AR at 328–32 (9 August 2021 Market Research Report). The Air Force determined only one large business, Accenture Federal Services and Salesforce, and one small business, Relocation Management

Worldwide, could be considered "capable" of building a PCS automation solution able to meet its needs. *See id.* The Air Force characterized mLINQS as "tentatively capable" of meeting the Air Force's requirements. AR at 328 (9 August 2021 Market Research Report) (observing mLINQS "purports [to] support[] SFIS structure, but this has not been proven and is incomplete").

The CO sought to solicit the contract under full and open competition procedures given the Air Force's research yielded only one small business deemed capable of meeting the contract requirements. AR at 333 (9 September 2021 Small Business Coordination Record). On 8 September 2021, the Air Force's Small Business Professional and Small Business Director did not object to the proposed strategy. AR at 334 (9 September 2021 Small Business Coordination Record). On 9 September 2021, the Small Business Administration ("SBA") approved the determination to use a full and open competition procedure. *Id.* The Air Force subsequently issued solicitation FA701422R0002 ("RFP solicitation"), as an unrestricted acquisition, on 14 October 2021. AR at 341 (14 October 2021 RFP), 408 (14 October 2021 Instructions to Offerors). The performance work statement for the solicitation required the awardee provide a "PCS solution that supports the [Air Force's] requirements for Active Duty civilian and uniformed PCS processing." AR at 433 (24 Sept. 2021 PWS). An acceptable system would have the capacity to process at least 25 varieties of civilian relocation and 15 varieties of uniformed relocation. AR at 433–34 (24 Sept. 2021 PWS). The solicitation initially set the offer due date as 12 November 2021. AR at 341 (14 October 2021 RFP). The Air Force amended the solicitation to extend the response date: first to 26 November 2021, AR at 497–98 (Solicitation Amendment 2), and ultimately to 1 December 2021, AR at 580–81 (Solicitation Amendment 3). mLINQS teamed with Kearney to compete under the RFP. AR at 10 (2 August 2018 Limited Sources Justification and Approval).

### D.   9 November 2021 PIA Investigation and 30 November 2021 Cancellation of RFP Solicitation

On 9 November 2021, the Air Force CO inadvertently uploaded a confidential price proposal from Kearney to SAM.gov. AR at 593 (Email Regarding Inadvertent Release of Proprietary Information). On 12 November 2021, outside counsel for Kearney alleged the posting of Kearney's data amounted to a violation of the Procurement Integrity Act ("PIA") and requested the Air Force "fully investigate the matter," "sole source the . . . contract to Kearney," "withhold the issuance of the [RFP]," and "postpone the competition on the . . . contract." AR at 624 (Vendor Notice of PIA Violation). After concluding an internal investigation on 7 April 2021, the Air Force ultimately found no PIA violation had occurred because there was no evidence the CO "knowingly posted Kearney's proprietary data." AR at 640 (PIA Violation Findings). Notwithstanding the result of the investigation, the Air Force required all bidders for PCS and related contracts to certify they (1) either did not access Kearney's data or had deleted it; and (2) did not use Kearney's data in preparing their proposals. AR at 695 (23 June 2022 Correspondence re: PCS Modernization Contract); *see also* AR at 773–74 (24 August 2022 Email to Tier 2 Vendors—Amendment).

On 30 November 2021, the CO cancelled the solicitation. *See* AR at 629 (30 November 2021 SAM.gov Posting—Solicitation Cancelled). The CO explained she did so because, due to

the limitations of the SAM.gov website, a solicitation could only be cancelled, not suspended. AR at 661 (PIA Violation Findings—Investigation Questions) (noting although the agency's counsel had "recommended a suspension of the solicitation due to the Kearney complaint, . . . a solicitation could not be suspended in SAM.gov").  Additionally, the Air Force intended to add "licensure requirements so the effort [was] changing."  *Id.*; *see* AR at 695 (23 June 2022 Correspondence re: PCS Modernization Contract) (stating "the original solicitation was cancelled due to an investigation as well as changes to the PWS to incorporate the licenses").  On 15 December 2021, mLINQS contacted the CO to indicate its "team, which is comprised of mLINQS and Kearney" was interested in trying to meet the requirements the Air Force included in the solicitation.  AR at 632 (15 December 2021 mLINQS Email).  mLINQS stated the mLINQS/Kearney team wanted to meet with Air Force contracting officials and suggested the team could submit an unsolicited offer.  *Id.*  mLINQS also invited the Air Force to "consider [awarding] a sole source to our team" or issue a "modification to one of Kearney's existing . . . contracts."  *Id.*  The Air Force declined these invitations.  AR at 697–98 (30 July 2022 Email Correspondence).

### E.    18 August 2022 TOPR Resolicitation

Following the Air Force's cancellation of the RFP, mLINQS contacted the Air Force asking about plans for re-solicitation and offering to demonstrate mLINQS's latest developments.  AR at 632–33 (15 December 2021 mLINQS Email), 697–701 (30 July 2022 Email Correspondence).  On 8 February 2022, the CO advised mLINQS "there is no estimated release date" for the new "RFP" but it "may be released in April or May" of 2022.  AR at 698 (30 July 2022 Email Correspondence).  Nearly eight months after the cancellation and four months after the conclusion of its PIA investigation, the Air Force began the process of acquiring a PCS automation solution through its existing Air Force Strategic Transformation Support ("AFSTS") contract, a multiple-award Indefinite Delivery Indefinite Quantity ("IDIQ") contract. AR at 745 (18 August 2022 Request Form—Task Order).  On 28 July 2022, the Air Force CO sent the five Tier 2 vendors listed on the AFSTS contract a draft Statement of Objectives ("SOO") for a task order under the AFSTS contract.  AR at 702 (28 July 2022 Email to Tier 2 Vendors).  The Air Force held an industry day briefing on 5 August 2022, *id.*, and responded to questions from potential offerors, AR at 726–41 (Industry Questions and Answers).

On 18 August 2022, the CO issued a task order proposal request ("TOPR") to the Tier 2 vendors on the AFSTS contract.  AR at 749 (18 August 2022 Email to Tier 2 Vendors).  In contrast to the performance work statement for the cancelled RFP solicitation, *see* AR at 408 (14 October 2021 Solicitation—Instructions to Offerors), 433 (14 October 2021 Solicitation—Performance Work Statement), the proposal request sought a developmental solution for a subset of all Air Force relocations, requiring only a "Proof of Concept . . . PCS solution that supports [the Air Force's] requirements for the end-to-end Active Duty Uniformed PCS process."  AR at 757–58 (18 August 2022 Email to Tier 2 Vendors—Statement of Objectives).  The proposal request also established an abbreviated period of performance:  the task order recipient would have 12 months to deliver such a proof of concept.  AR at 750 (Task Order Proposal Request Coversheet), 757 (18 August 2022 SOO).  Proposals were due 31 August 2022.  AR at 750 (Task Order Proposal Request Coversheet).  The Air Force subsequently modified the request to require offerors certify they did not misuse the data from

Kearney inadvertently published to SAM.gov the previous year.  AR at 773–74 (24 August 2022 Email to Tier 2 Vendors—Amendment).

### F.   29 August 2022 mLINQS's Agency-Level Protest

On 29 August 2022—two days before responses to the task order proposal request were due—mLINQS initiated an agency-level protest with the Air Force.  AR at 775 (29 August 2022 mLINQS Email—Agency-Level Protest and Exhibits).  In its protest, mLINQS argued "the agency failed to comply with the Rule of Two and Related Small Business requirement." [3]  AR at 977 (20 September 2022 Agency Decision—mLINQS Protest).  Additionally, mLINQS alleged "the agency failed to satisfy its obligation under the Federal Acquisition Streamlining Act ('FASA') and the Federal Acquisition Regulations ('FAR') to accommodate commercial solutions to the maximum extent practicable."  AR at 784–86 (mLINQS Agency-Level Protest).

On 20 September 2022, the Air Force denied mLINQS's protest.  AR at 976 (20 September 2022 Agency Decision—mLINQS Protest).  Regarding mLINQS's Rule-of-Two challenge under the FAR, the Air Force concluded it satisfied its obligations because it "conducted market research . . . [and b]ased on this market research, . . . determined that there were not two small business concerns capable of performing the contract and submitting acceptably priced offers."  AR at 981 (20 September 2022 Agency Decision—mLINQS Protest) (noting "[o]nly one small business was deemed fully capable").  Moreover, the SBA "concurred that there was no reasonable expectation that offers will be obtained from at least two responsible small business concerns offering the products of different small business concerns and that award will be made at fair market prices."  Id.  The Air Force observed such determinations are "a matter of business judgment within the contracting officer's discretion."  Id.  Additionally, the Air Force emphasized the fact mLINQS was aware the Air Force was not setting the solicitation aside for small business as early as 14 October 2021, "when the Air Force posted the requirement as a full and open competitive solicitation," but mLINQS "did not submit a pre-award protest at that time" to challenge the agency's set-aside determination.  Id.

The agency found mLINQS's claim the Air Force failed to satisfy its statutory and regulatory obligations regarding the use of commercial solutions unavailing because its market research report "document[ed] multiple commercial systems which could be leveraged [and n]owhere does the TOPR . . . [SOO] abandon the concept of using a modified existing commercial system to meet its requirements."  AR at 979 (20 September 2022 Agency Decision—mLINQS Protest).  Further, "the Air Force gathered information from various sources about the capabilities of existing commercial solutions, and incorporated feedback from industry to revise its PCS Automation . . . [PWS] to allow for a competitive commercial solution."  Id.  The agency observed although "10 U.S.C. § 3453 requires the procuring agency to seek a commercial solution to the maximum extent practicable, . . . it does not mandate the use of a COTS item."  Id.  The agency concluded it complied with its statutory obligations by "performing market research and issuing a commercial TOPR."  Id.

---

[3] As explained *infra* Section V.B, the Rule of Two requires COs to set aside any acquisition over the simplified acquisition threshold for small business participation when there is a reasonable expectation:  (1) offers will be obtained from at least two responsible small business concerns; and (2) the award will be made at fair market prices.  FAR 19.502–2(b).

### G.    29 August 2022 Award of AFSTS Task Order

On 29 August 2022, the Air Force awarded task order No. FA701422F0339 ("AFSTS task order") to defendant-intervenor Deloitte Consulting LLP ("Deloitte").  AR at 985 (AFSTS Task Order Standard Form 1449).  The award was made for a period of only five months.  AR at 987 (AFSTS Task Order "Supplies or Services & Prices or Costs").

## II.    Procedural History

On 22 September 2022, plaintiff filed its complaint, ECF No. 1, and a motion for leave to file complaint under seal and motion for protective order, ECF No. 2.  On 28 September 2022, Deloitte filed a motion to intervene, ECF No. 10.  On 3 October 2022, the Court granted mLINQS's motion to seal document and motion for protective order as well as Deloitte's motion to intervene, ECF No. 12.  On 11 October 2022, mLINQS filed an unopposed motion for a protective order, ECF No. 14, which the Court subsequently granted, ECF No. 15.  On 20 October 2022, the government filed the Administrative Record, ECF No. 23.  On 10 November 2022, mLINQS filed its sealed motion for judgment on the administrative record ("MJAR"), ECF No. 24.  On 1 December 2022, defendant-intervenor and the government each filed a motion to dismiss or, in the alternative, for judgment on the administrative record and response to plaintiff's motion for judgment on the administrative record, ECF Nos. 26, 27.[4]  On 12 December 2022, plaintiff filed a response to the defendants's motions and reply in support of its MJAR, ECF No. 29 ("Pl.'s Reply MJAR").  The same day, plaintiff filed a motion to strike the appendix of the government's consolidated motion to dismiss and cross-MJAR.  *See* Pl.'s Mot. to Strike, ECF No. 30.  The government replied in supports of its motion to dismiss and cross-MJAR on 22 December 2022, ECF No. 36 ("Gov't's Reply MJAR").  The government responded to plaintiff's motion to strike on 29 December 2022, and plaintiff filed a motion in support of its motion on 5 January 2023.  *See* Gov't's Resp. to Pl.'s Mot. to Strike, ECF No. 37; Pl.'s Reply in Supp. of Mot. to Strike, ECF No. 39.[5]  On 26 January 2023, the Court held oral argument regarding plaintiff's motion to strike and the parties' cross-MJARs.  *See* Scheduling Order, ECF No. 32; Oral Arg. Trans., ECF No. 48 ("Tr.").

## III.    The Government and Defendant-Intervenor's Motions to Dismiss Regarding mLINQS's Forfeited Ability to Challenge Agency Actions Because it Waited More

---

[4] The government originally agued plaintiff lacked standing to challenge the agency's cancellation of the solicitation because "mLINQS [could not] show that it alone—rather than a team that included Kearney—intended to bid on the solicitation."  Gov't's MTD/Cross-MJAR at 21.  At oral argument, the government clarified its motion to dismiss for lack of standing was moot after mLINQS presented its "teaming agreement" agreement with Kearney.  Tr. at 24:17–20 (THE GOVERNMENT:  "[A]fter we saw the teaming agreement, we understood that there was a valid teaming arrangement that appears to be in place and that [mLINQS and Kearney] were going to bid . . . as a team.").
[5] At oral argument, the parties agreed plaintiff's motion to strike the appendix of the government's consolidated motion to dismiss and cross-MJAR is moot if the Court does not rely on or cite the declarations in the appendix.  Tr. at 18:10–19:15.  The Court does not utilize the declarations in its Opinion and Order because their content is already adequately represented in the Administrative Record or does not preclude judicial review by providing only background information.  *See Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 166 (2011) ("It is well settled that the 'primary focus' of the court's review of agency decision making 'should be the materials that were before the agency when it made its final decision.'") (quoting *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 349–50 (1997)).

**Than Ten Months to Bring its Protest**

A.   **The Parties' Arguments Regarding mLINQS's Forfeited Ability to Challenge Agency Actions**

The government moves to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted because "mLINQS forfeited its ability to challenge the Air Force's contracting actions because it waited more than ten months to do so." Gov't's MTD/Cross-MJAR at 17.  In its briefing, the government said, "'In the case of a bid protest, in particular, this Court has explained that a plaintiff cannot sit on his rights while allowing the [g]overnment to move forward on a contract.'" *Id.* at 29 (quoting *Reilly v. United States*, 104 Fed. Cl. 69, 79 (2012)).  At oral argument, it was clear the government was only arguing a *Blue & Gold* waiver.  Tr. at 12:25–24:1 ("[THE GOVERNMENT]:  [W]e make a *Blue & Gold* forfeiture argument."); *see also* Gov't's MTD/Cross-MJAR at 17 ("Rather than challenging the solicitation when it was first issued on 14 October 2021, . . . mLINQS chose to 'sit on [its] rights to challenge what [it] believe[d was] an unfair solicitation.'") (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007)).  The government, likewise, cites to "*Blue & Gold* and its progeny . . . talk[ing] about protests hav[ing] to be expeditious" but fails to raise the affirmative defense of laches or a lack of diligence in bringing a claim prejudicing the opposing party.  Tr. at 35:23–24, 36:1–4 ("THE COURT:  The sounds like a laches issue, though.  [THE GOVERNMENT]:  I think the Federal Circuit has, at times, considered it to be akin to laches.").[6]

Plaintiff argues it "raised its challenges as soon as the Air Force revealed its true plans." Pl.'s Reply MJAR at 13.  mLINQS "had no reason to challenge the cancellation of the RFP while the PIA investigation was pending or while CO Ross was (mis)leading mLINQS to believe that a new RFP (not TOPR) was forthcoming." *Id.* at 14–15.  Until the Air Force revealed their post-RFP plan, "mLINQS could not have known that the Air Force would replace the RFP with a closed TOPR, excluding mLINQS from competing." *Id.* at 15.  Additionally, plaintiff clarifies it "could not have known the Air Force would solicit a developmental proof of concept through the

---

[6] The government did not raise the affirmative defense of laches, where a plaintiff is not diligent in making its claims, prejudicing the opposing party. *See Cornetta v. United States*, 851 F.2d 1372, 1375 (Fed. Cir. 1988) ("Fundamental to laches is the maxim that equity aids the vigilant, not those who slumber on their rights.").  To qualify for laches, a delay must be both unreasonable and unexcused. *Id.* at 1378; *see also Gava v. United States*, 225 Ct. Cl. 676, 679 n.2 (1980).  Even if the government had raised a laches argument, it would likely fail given the surrounding circumstances suggest the cancelled RFP solicitation would necessitate another competitive solicitation as opposed to a task order, and there is uncertainty as to how long the PIA investigation would continue. *See* AR at 697 (Email from CO Ross to mLINQS, noting "[th]ere is no new update on the release of the RFP"); AR at 695 (Email from CO Ross to the Air Force's Deputy Assistant Secretary for Financial Operations documenting "the original solicitation was cancelled due to an investigation").

Nor did the government highlight a delay under an irreparable harm theory.  In *Rex Service*, the Federal Circuit held if a party does not bid during the bid period, it does not have standing regardless of any illegalities by the government in the bid process. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (2006).  Plaintiff, in this case, bore "no risk of irreparable harm until [the agency] signal[ed] they are going to go into the TOPR." Tr. at 52:17–53:1; AR at 749–50, 697 (Email from CO Ross to mLINQS, noting "[th]ere is no new update on the release of the RFP"). *Rex Service*, where plaintiff caused its own irreparable harm by delaying its claim for standing purposes, is not applicable here.

TOPR until mLINQS finally obtained a copy of the SOO." *Id.* Plaintiff maintains its timely protest "put the Air Force on clear notice of its claims." *Id.*

### B. *Blue & Gold* Waiver

In *Blue & Gold,* the government issued a solicitation for, inter alia, "ferry transportation" and "concessions" services at Alcatraz Island. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1311 (Fed. Cir. 2007). After Blue & Gold lost the contract, it filed a protest indicating the awardee had not properly included in its bid "the wages and benefits for its employees required by the Services Contract Act." *Id.* at 1312. The Court of Federal Claims concluded Blue & Gold was actually challenging the terms of the solicitation, and thus had waived its opportunity to protest. The Federal Circuit agreed, noting the solicitation itself "did not include any requirement that the bidders consider the Service Contract Act." *Id.* at 1313. In holding Blue & Gold had waived its opportunity to protest, the Federal Circuit noted the Government Accountability Office ("GAO") regulation, 4 C.F.R. § 21.2(a)(1), indicating GAO protests "based upon alleged improprieties in a solicitation which are apparent prior to . . . the time set for receipt of initial proposals shall be filed prior to . . . the time set for receipt of initial proposals." *Blue & Gold Fleet*, 492 F.3d at 1314. The Federal Circuit concluded "'[v]endors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive the award.'" *Id.* The Federal Circuit has since held this reasoning "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012).

### C. Whether mLINQS Forfeited the Ability to Challenge Agency Actions

The waiver rule established in *Blue & Gold* provides contractors need to challenge patent errors involving the solicitation *before the close of bidding*, or their protests will be barred as untimely at the Court of Federal Claims. *Blue & Gold Fleet*, 492 F.3d at 1315. At oral argument, the government was unable to articulate a specific case where the facts—notably where the agency cancels a solicitation before receiving bids—apply to this case, simply noting "the penumbra of *Blue & Gold* and its progeny" apply. *See* Tr. at 36:15–17. Further, the government could not identify a deadline by which mLINQS had to file its protest. *See* Tr. at 36:24–37:18.[7] The government claims "the cancellation clock" started on 30 November 2021 but fails to determine when the clock stopped ticking. *See* Tr. at 27:20–22.

Federal Circuit precedent dictates the crucial question in determining if a protester must challenge an issue at the agency prior to this court is whether the issue was previously apparent. *See COMINT Sys. Corp.* 700 F.3d at 1382. In *COMINT* Sys*tems*, the Circuit held "where bringing the challenge prior to the award is not practicable, it may be brought thereafter. But,

---

[7] "THE COURT: So, let's say *Blue & Gold* and its progeny are what you are applying. When was the deadline for mLINQS to file the protest? [THE GOVERNMENT]: There is no specific deadline . . . . THE COURT: Is it one month? Three months? Six months? [THE GOVERNMENT]: The Court has talked about a couple of months. THE COURT: So how many? [THE GOVERNMENT]: I don't think it's clear . . . . THE COURT: Ten is too many? [THE GOVERNMENT]: Ten is certainly too many. THE COURT: Is nine? [THE GOVERNMENT]: Nine would probably be too many as well. THE COURT: Eight? [THE GOVERNMENT]: I think on the order of one or two months . . . ." Tr. at 36:24–37:18.

assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract." *Id.*; *see also VS2, LLC v. United States*, 155 Fed. Cl. 738, 754–55 (2021) ("*COMINT* may be read as *expanding* the time in which a solicitation challenge may be filed in this Court where the grounds for the protest did not exist prior to the proposal due date – a common sense proposition given that a plaintiff could not, without the advantage of a time machine or crystal ball, have known about the basis for its action."). Here, the issues plaintiff is challenging— particularly in regard to the TOPR—did not arise prior to the proposal due date. In fact, the issues did not arise until at least 11 August 2022, when mLINQS directly reached out to CO Hill for a copy of the TOPR, considering the TOPR was not posted publicly. AR at 749 (Email from CO Hill to Tier 2 Vendors attaching "the TOPR for FA701422STS57 PCS Automation"). mLINQS had to assume the PIA investigation concluded when the Air Force resolicited the contract under the TOPR because mLINQS had no notice the investigation was complete on 7 April 2021 until the Administrative Record was filed in the Court of Federal Claims. Tr. at 31:1–6 ("[PLAINTIFF]: We learned in the record that [the PIA investigation] formally ends on April 7th and ends with both an internal determination and findings in a letter from Air Force . . . counsel to Kearney counsel. . . . It seems the agency has decided they are not going to do any kind of sole-source. They want to keep going with competition under an RFP. mLINQS doesn't know that."). At a minimum, the ongoing PIA investigation complicated the solicitation timeline and delayed a resolicitation, so plaintiff was justified in waiting for a PIA resolution before bringing a protest. *See COMINT Sys. Corp.*, 700 F.3d at 1383 n.6 (holding *Blue & Gold* inapplicable "because plaintiff did not learn of its ineligibility determination until the date the contracts were awarded").

During the PIA investigation, mLINQS was reasonably under the impression the RFP could be reinstated and was never informed of plans to resolicit the PCS modernization contract as a TOPR. Tr. at 45:19–46:1.[8] The Air Force and mLINQS had an ongoing relationship after the RFP cancellation. Specifically, CO Ross notified mLINQS in February 2022 she was "still working with the customer on the PWS/RFP for PCS Modernization," advising the "RFP may be released in April or May timeframe which is subject to change." AR at 698 (30 July 2022 Email Correspondence). When mLINQS inquired regarding the RFP on 30 June 2022, CO Ross stated "[t]here is no new update on the release of the RFP" and encouraged mLINQS to contact the new Program Manager. AR at 697 (30 July 2022 Email Correspondence). The government agreed the reinstatement of the RFP was in the realm of possibilities as a remedy to the PIA investigation. Tr. at 46:2–4.[9] FAR 3.104, "Procurement Integrity—Violations or possible violations," provides cancellation of a procurement as part of a non-exhaustive list of what a head of contracting activity "may direct" a CO to do after a PIA violation has been found. *See* FAR 3.104-7(d)(1) (directing the CO of an unawarded contract may: cancel the procurement; disqualify an offeror; or "[t]ake any other appropriate actions in the interests of the [g]overnment"). mLINQS's state of mind with respect to the contract after the cancellation in

---

[8] "THE COURT: So back to my original state of mind question, mLINQS is thinking, well, the prior RFP from a couple months ago could be reinstated after this PIA? [PLAINTIFF]: I don't think that's the only thing that could have happened. THE COURT: But that's a possibility? [PLAINTIFF]: Yes, and it's what Contracting Officer Ross is signaling to us." Tr. at 45:19–46:1.

[9] "THE COURT: [The government], is [reinstatement of an RFP] in the range of possibilities or is that not possible? [THE GOVERNMENT]: Maybe . . . ." Tr. at 46:2–4.

November 2021 reasonably assumed the agency was "still in the process of figuring out how to open competition for the PCS modernization program through an RFP." Tr. at 30:12–23; *see Blue & Gold Fleet*, 492 F.3d at 1355 ("[The] opinion in *Blue & Gold Fleet* does not suggest that a contractor can challenge a procurement system before actually suffering or being likely to suffer an injury. *Blue & Gold Fleet* holds only that if the contractor is injured and has the 'opportunity to object' to the solicitation, it cannot defer its challenge to a period after which the contract is awarded.").

### D.     Conclusion Regarding mLINQS's Forfeited Ability to Challenge Agency Actions

The government only argues *Blue & Gold* for the proposition mLINQS forfeited its ability to challenge agency actions because it waited more than ten months to bring its protest, but *Blue & Gold* is not applicable. *Blue & Gold* is a deadline, and "aside from the limited circumstances in which the Federal Circuit has done otherwise, any waiver doctrine should be applied in narrowly defined circumstances." *VS2, LLC v. United States*, 155 Fed. Cl. 738, 757 (2021) (citing *Blue & Gold Fleet*, 492 F.3d). mLINQS did not waive its right to challenge the Air Force's actions. "The Blue & Gold forfeiture standard exists in recognition of the need for interested bidders to call the agency's attention to solicitation problems of which they reasonably should be aware"; mLINQS was not reasonably aware of the TOPR until around 11 August 2022 when mLINQS "recently learned about the Air Force's draft SOO for FA701422STS57 PCS Automation released on AFSTS." *Inserso Corp. v. United States*, 961 F.3d 1343, 1351 (Fed. Cir. 2020); AR at 967–68; *see Blue & Gold Fleet*, 492 F.3d at 1313 ("[A] party who has the opportunity to object to the terms of a government solicitation containing a *patent* error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a [§ 1491(b)] bid protest action in the [Claims Court]."). The Court therefore denies the government and defendant-intervenor's motions to dismiss as to mLINQS's forfeited ability to challenge agency actions. *See Inserso*, 961 F.3d at 1351; *Blue & Gold Fleet*, 492 F.3d at 1313.

### IV.    The Government and Defendant-Intervenor's Motions to Dismiss Regarding the FASA Task Order Bar Prohibiting Court of Federal Claims' Jurisdiction Over mLINQS's Complaint

### A.     The Parties' Arguments Regarding the FASA Task Order Bar

The government argues "the ex-post contract vehicle choice by the agency controls divestment of the Court's jurisdiction." Tr. at 78:15–79:10. The government maintains other than the three exceptions enumerated in the FASA—where the order increases the scope, period, or maximum value of the contract under which the order is issued—the Court does not have jurisdiction. Tr. at 68:4–8 (citing 41 U.S.C. § 4106(f)(1); 10 U.S.C. § 2304c(e)). The government concludes "at the end of the day, [it] is [the government's] contention that jurisdiction [is] all incumbent upon the agency for which procurement vehicle it plans to go with[.]" Tr. at 75:1–5.

Defendant-intervenor—and the government—move to dismiss plaintiff's complaint for

lack of subject-matter jurisdiction because "FASA explicitly precludes the exercise of jurisdiction over protests 'in connection with the issuance or proposed issuance of a task or delivery order . . . .'" Def.-Int.'s Cross-MJAR at 2 (citing 41 U.S.C. § 4106(f)(1)). Defendant-intervenor maintains "mLINQS's commercial preference and Rule of Two claims challenge procurement decisions that are indistinct from, and seek a permanent injunction of, the issuance of the Task Order." *Id.* Specifically, defendant-intervenor argues "mLINQS seeks to disturb the Agency's Task Order by requesting restoration of the *status quo ante* that existed before the TOPR was ever even 'conceived' by the Agency." *Id.* (citing Pl.'s MJAR at 37). According to defendant-intervenor, the remedy is dispositive of jurisdiction; for example, the Court can remand the RFP but cannot, by extension, cancel the TOPR. Tr. 70:3–6 ("[DEFENDANT-INTERVENOR]:  In this case, . . . the [p]laintiff is requesting the Court to order relief that would essentially rescind a task order that has already been awarded.").

While the government and defendant-intervenor agree the Court has jurisdiction over plaintiff's challenge regarding the cancellation of the RFP, they are unable to reconcile the implication of the task order on the remedy for the RFP cancellation.  Tr. at 100:21–102:7.  If the Court were to find the cancellation of the RFP due to the PIA issue was arbitrary and capricious and needs to be reversed, the government notes "[t]hat's more of a question of remedy, but it certainly depends on what the Court finds[;] [b]ut all of that is separate from the task order."  Tr. at 102:10–11, 19–20.  The government adds:  "[T]he task order issuance is not within this court's jurisdiction to review.  So, there's no question of remedy there if it's not within the Court's jurisdiction . . . .  [T]hey are two separate contracting actions[.]"  Tr. at 102:25–103:5.  Overall, the government and defendant-intervenor agree "the Court does not have jurisdiction with respect to the Rule of Two analysis as it relates to the task order[,] [a]nd the Court does not have jurisdiction with respect to the FASA commercial items analysis as it relates to the order.  The Court does have jurisdiction over the decision to cancel the RFP."  Tr. at 103:16–104:16.

Plaintiff argues the Court has jurisdiction to hear this case because each of mLINQS's claims is an "alleged violation of statute or regulation in connection with a procurement or a proposed procurement," Pl.'s MJAR at 12 (citing 28 U.S.C. § 1491(b)(1))—and none are "in connection with the issuance or proposed issuance of a task or delivery order," such as to implicate the FASA task order bar, *Id.* (citing 10 U.S.C. § 3406(f)).  First, plaintiff contends the Court has jurisdiction to review an agency's decision to cancel a solicitation "where the cancellation was completely isolated from the eventual solicitation of a PCS solution by a request for task order proposals."  *Id.* at 13.  Second, plaintiff advances the Court's jurisdiction because the Air Force did not conduct any market research or small business considerations specific to the AFSTS TOPR; instead, the Air Force relied on market research and SBA coordination that occurred before the Air Force issued the RFP from July to September 2021.  Pl.'s MJAR at 14.  As a result, plaintiff contends "There is no causal and direct connection between (i) research conducted for the RFP and (ii) the eventual decision, made nearly a year later, to solicit a PCS solution through the AFSTS IDIQ."  *Id.*

**B.      Court of Federal Claims Bid Protest Jurisdiction Under 28 U.S.C. § 1491 and FASA Task Order Bar**

The government and defendant-intervenor agree the Court has jurisdiction to decide

plaintiff's challenge to the Air Force's cancellation of the RFP solicitation as arbitrary and capricious.  Tr. at 100:21–102:7.  Generally, in an action brought pursuant to § 1491(b) of the Tucker Act, the Court reviews "the agency's actions according to the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706."  *See Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019) (citing 28 U.S.C. § 1491(b)(4)).  "In applying this standard of review, [the Court] determine[s] whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  *Id.* (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009)).  "When a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.'"  *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001)).  Under § 1491(b)(1), specifically, the Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).

The government and defendant-intervenor characterize plaintiff's other two claims—alleging the Air Force failed to satisfy applicable FAR small business set-aside rules and market research and acquisition planning obligations pursuant to the FAR and FASA—as barred by the Federal Acquisition Streamlining Act of 1994 ("FASA").  The FASA generally bars bid protests at the Court of Federal Claims in connection with the issuance of task or delivery orders under Federal Acquisition Regulation ("FAR") Part 16 indefinite-delivery, indefinite-quantity ("IDIQ") contracts.  Specifically, the Court lacks jurisdiction to hear protests "in connection with the issuance or proposed issuance of a task or delivery order except for . . . a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued."  *See* 41 U.S.C. § 4106(f)(1); 10 U.S.C. § 2304c(e).  The latter phrase mirrors the second and third prongs of § 1491(b)(1)—i.e., "a proposed award or the award of a contract"— with FASA replacing the Tucker Act's reference to "award" and "contract" with, respectively, "issuance" and "task order."  *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 101 (2020).  The second and third prongs of § 1491(b)(1), properly understood, include challenges to the results or merits of a procurement—an award or proposed award of a contract—but do not cover solicitation protests, the latter of which is a distinct cause of action under, in part, the Tucker Act, as amended by the Alternative Dispute Resolution Act of 1988.[10]

---

[10] "The Tucker Act, as amended by ADRA, requires the COFC in a bid protest case to apply the APA's standard of review, pursuant to which government agency action is reviewed to determine whether it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'without observance of a procedure required by law.'"  Matthew H. Solomson, *Court of Federal Claims Jurisdiction, Practice, and Procedure* 8-37 (2016) (footnote omitted) (citing 28 U.S.C. §1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Resource Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1243 (Fed. Cir. 2010) (citing 28 U.S.C. §1491(b)(4) and noting "[t]he ADRA also directed the court to use the standards of review provided by the APA in reviewing the bid protest suits"); *American Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1300 (Fed. Cir. 2001) ("[W]hile pre-ADRA protests brought in the Court of Federal Claims were governed by a narrow standard of review, *see Keco Indus., Inc. v. United States*, 203

*See id.*

### C.    Federal Circuit Caselaw on the FASA Task Order Bar

The Federal Circuit interpreted FASA's bar on "protests" made "in connection with the issuance or proposed issuance of a task or delivery order" in *SRA* and *22nd Century Technologies*.  *See* 41 U.S.C. § 4106(f)(1).  In *SRA*, a protester alleged the General Services Administration ("GSA") violated the law by waiving an organizational conflict of interest in the context of a task order award.  *SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1410 (Fed. Cir. 2014).  GSA's waiver was discretionary and occurred 102 days after GSA issued the task order, so the Court of Federal Claims held it had jurisdiction.  *Id.* at 1412.  On appeal, the Federal Circuit disagreed, holding the Court of Federal Claims lacked jurisdiction because the protest of the waiver was "in connection with the issuance" of the task order.  *Id.* at 1413.  The Federal Circuit cautioned while "nothing in FASA's language *automatically exempts* actions that are temporally disconnected from the issuance of a task order[,] . . . *a temporal disconnect may, in some circumstances, help to support the non-application of the FASA bar*."  *Id.*  At oral argument, the government claimed "a subsequent modification to a task order . . . could be something that falls within this language" of temporally disconnected from the issuance of a task order.  Tr. at 71:23–24.  The government concludes "*SRA* is instructive for the point that when there's a causal connection to the issuance of a task order, as is here[—]at heart they are challenging the decision to issue a task order under the AFSTS[—]the FASA bar is pretty clear and categorical."  Tr. at 71:25–72:5.

To understand the Federal Circuit opinion of *22nd Century*, the Court first analyzes the Court of Federal Claims opinion by Judge Firestone.  Plaintiff 22nd Century Technologies, Inc. challenged the Army's decision to terminate a task order awarded to 22nd Century as a small business after the SBA's Office of Hearings and Appeals ("OHA") disagreed with the size determination.  *22nd Century Techs., Inc. v. United States*, 157 Fed. Cl. 152 (2021).  Judge Firestone examined plaintiff's complaint, concluding "22nd Century's allegations demonstrate[] the challenged OHA decision is 'directly and causally' connected to the task order at issue and therefore falls within FASA's purview."  *Id.* at 158 (quoting *SRA Int'l*, 766 F.3d at 1413).  Specifically, she noted:

> OHA's decision arises from size protests directly related to the task order awarded to 22nd Century.  OHA's decision interprets the Task Order RFP's terms.  In challenging OHA's decision, 22nd Century asks this court to interpret the Task Order RFP's terms.  22nd Century also challenges the Army's termination of the task order award based on OHA's decision, an action that is indisputably connected to the task order.

*Id.*  In her opinion holding "22nd Century's challenge based on OHA's decision is barred by FASA," *id.*, Judge Firestone distinguished previous Federal Claims cases overcoming the FASA task order bar, *BayFirst*, *MORI*, and *Tolliver*:

---

Ct. Cl. 566, 492 F.2d 1200, 1203–04 (1974), the ADRA expressly made the APA standard of review applicable to all bid protest actions . . . .")).

In *BayFirst*, *MORI Associates*, and *Tolliver*, the relevant agencies cancelled solicitations and proposed to procure or procured the services under a different procurement vehicle involving task orders.  *MORI Assocs.*, 102 Fed. Cl. at 510–16; *BayFirst*, 104 Fed. Cl. at 498–99; *Tolliver*, 151 Fed. Cl. at 80–83.  The plaintiffs in those cases raised challenges to the agencies' cancellation decisions and the *lawfulness of the replacement procurement method*, separate from any individual task order.  *MORI Assocs.*, 102 Fed. Cl. at 510–11; *BayFirst*, 104 Fed. Cl. at 500–01; *Tolliver*, 151 Fed. Cl. at 84.  The courts concluded that these decisions arose during a stage of the procurement process that was logically distinct from the issuance or proposed issuance of any individual task order, such that FASA's bar was inapplicable.  *See MORI Assocs.*, 102 Fed. Cl. at 533–34 (holding that the challenge to the lawfulness of the replacement procurement method, claiming that the agency failed to comply with the "Rule of Two," was within the court's jurisdiction despite FASA); *Tolliver*, 151 Fed. Cl. at 93–94 (same); *BayFirst*, 104 Fed. Cl. at 507–08 (holding that the cancellation decision was within the court's jurisdiction despite FASA).  Here, in contrast, 22nd Century's challenge to OHA's decision is not a challenge to a discrete procurement action entirely distinct from the issuance of a task order.  As discussed above, 22nd Century's allegations in this case directly and exclusively involve the subject task order.

*Id.* at 158–59 (emphasis added).

On appeal, the Federal Circuit affirmed Judge Firestone's decision distinguishing *Tolliver*, *MORI*, and *BayFirst*.  Judge Dyk confirmed "22nd Century's challenge is to the alleged failure of the task order to require bidders to recertify as small businesses, and 22nd Century's claim is that the only relevant size requirement for purposes of its task order proposal was in the original IDIQ Contract."  *22nd Century Techs. v. United States*, 57 F.4th 993, 1000 (Fed. Cir. 2023).  The Federal Circuit also delineated between size protests brought at the SBA and bid protests brought at this court:

> [A]s the Claims Court recognized, the court [] has jurisdiction to consider the propriety of an SBA size determination in a bid protest case or other contract action over which it has jurisdiction.  Where an SBA decision is made "in connection with a proposed procurement," the Claims Court would normally have jurisdiction to review that decision under § 1491(b)(1).

*Id.* at 999 (citing *Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015)).  Judge Dyk concluded "bid protest jurisdiction here is barred by FASA" because 22nd Century, as Judge Firestone recognized, disputes "an SBA size determination where the size determination is challenged 'in connection with the issuance of a task or delivery order.'"  *Id.*

### D.    Court of Federal Claims Caselaw on the FASA Task Order Bar

Although the decision of one judge of this court does not bind another, three similar cancellation cases from Judge Bush, Judge Wolski, and Judge Solomson are instructive.  In *BayFirst*, Judge Bush addressed the limits of the phrase "in connection with a procurement or

proposed procurement" in determining whether the FASA's bar on challenges in connection with the issuance or proposed issuance of a task or delivery order would bar the cancellation of a solicitation:

> If a procurement process is viewed as a continuum of acts and decisions by the procuring agency which culminates in the proposed issuance of a task order, the statutory ban casts a wide net and bars challenges to the cancellation of a previously-issued solicitation, because that decision clears the way for the issuance of a task order.

*BayFirst Sols, LLC,* 104 Fed. Cl. at 507. Although the Department of State began considering the proposed issuance of a task order before it cancelled a solicitation seeking a small business contractor—and continued to consider this option as its best option after the solicitation was cancelled—Judge Bush determined the cancellation decision was not "in connection with" the task order award, because the cancellation decision was "a discrete procurement decision and one which could have been the subject of a separate protest." *Id.*

In *MORI*, Judge Wolski analyzed the failure of an agency to conduct a Rule of Two analysis for a procurement that was later cancelled and resolicited as a task order. An agency of the Department of Health and Human Services ("HHS") cancelled an information technology ("IT") services procurement, and the incumbent small business contractor filed a pre-award bid protest challenging, inter alia, the agency's cancellation decision. *MORI Assocs.*, 102 Fed. Cl. at 510. "In the middle of the briefing schedule for dispositive motions concerning the cancellation, the government agency issued a request for quotations seeking to acquire by task order some of the services previously sought in the cancelled procurement." *Id.* Plaintiff filed a second supplemental complaint challenging the government's failure to determine whether the services should be set aside for a small business award, as well as a motion for a preliminary injunction. Judge Wolski determined:

> When an agency skips past the step of conducting Rule of Two analysis and proceeds with the plan of obtaining services through task order contracts, this does not, however, mean that a protest in response by an interested small business is one "in connection with the issuance or proposed issuance of a task or delivery order." 41 U.S.C.A. § 4106(f)(1). Merely because this failure to follow 48 C.F.R. § 19.502–2(b), if left unchecked, would ultimately result in the issuance of a task order does not necessarily connect a protest of that failure with that hypothetical order—which might never be proposed if the protest succeeds.

*Id.* at 533. In other words, "[t]he actual acquisition begins when an agency's needs are established, 48 C.F.R. § 2.101, and the set-aside decision, to be meaningful, must occur prior to the selection of the vehicle to be used to satisfy these needs, since certain vehicles may exclude small businesses." *Id.* Judge Wolski, as such, reasoned "[t]he 'procurement,' then, which this Rule of Two protest concerns, is a 'stage of the process of acquiring property or services' that falls after the establishment of the particular agency needs, but before the choice of the vehicle to satisfy these needs." *Id.* at 533–34 (citing 48 C.F.R. § 7.105(b)(1) & (b)(4)(ii)(B)(2) (2010) (describing the consideration of prospective sources, including small businesses, in written

acquisition plans)).  He added:

> This is a logically distinct step from the issuance or proposed issuance of task orders, which presupposes the selection of a multiple award task order contract vehicle to begin with.  Since at this stage an agency could just as well choose not to go down the task order road as to follow it, this choice is not "in connection with the issuance or proposed issuance of a task or delivery order" any more than it is in connection with an order using the GSA [Federal Supply Schedule ("FSS")], or with a negotiated procurement under FAR Part 15, or any other option at the agency's disposal.

*Id.*  Judge Wolski, ultimately, determined the court had jurisdiction over the challenge to the cancellation decision and over the challenge to the government's failure to follow the small business set-aside regulation.  He further determined the cancellation of the initial procurement was arbitrary, and plaintiff was entitled to a permanent injunction against that decision and a preliminary injunction preventing the agency from proceeding under the task order.  *Id.* at 554–55.

In *Tolliver*, Judge Solomson agreed with Judge Wolski, holding "the cancellation decisions themselves are far removed from the selection of a replacement acquisition vehicle." *Tolliver*, 151 Fed. Cl. at 99.  In *Tolliver*, service-disabled, veteran-owned small businesses ("SDVOSB") sought permanent injunctive relief from decisions by the Army to cancel two GSA FSS support staffing solicitations for the purpose of moving them from SDVOSB set-aside to a task order vehicle.  According to the court, the Army did not dispute there were "at least two responsible business concerns capable of performing the work at fair market prices, or that, in general, the Rule of Two is mandatory."  *Id.* at 113 (citing *Mgmt. & Training Corp. v. United States*, 115 Fed. Cl. 26, 44 n.13 (2014) ("[T]his court has consistently held that the Rule of Two is mandatory")).  The Army, instead, argued the Small Business Act and the FAR gave it the discretion "to make use of a multi-award contract without first conducting a [R]ule of [T]wo analysis to determine whether the task order should be set aside for small business."  *Id.* at 114.  Judge Solomson rejected this "sweeping inference."  *Id.* at 115.  He explained the FAR and Small Business Act provisions the Army cited, instead, tell the agency "how a multiple award contract may be structured or how a task order competition under a multiple award contract may be competed."  *Id.* at 114.  They do not address whether the agency may ignore the Rule of Two simply because the agency prefers to use a task order that already has been awarded.  *Id.* at 115.  As Judge Solomson explicated:

> [T]he fact that an agency has the discretion to partially set-aside "a portion" of a multiple award contract for small business does not lead to the ineluctable conclusion that having decided not to engage in a partial set-aside, an agency may thereafter dispense with the Rule of Two.  The latter does not follow from the former.  To the contrary, the grant of discretion applies even where the Rule of Two does not require a set-aside, but the grant of discretion does not somehow, by negative implication, eliminate the Rule of Two requirement.

*Id.*  As such, he concluded "[t]he Rule of Two unambiguously applies to 'any' 'acquisition,'

FAR 19.502–2, without any loophole for [] task orders." *Id.* at 114.  Judge Solomson noted "where the FAR intends to make the Rule of Two entirely inapplicable to the selection of a particular procurement vehicle, the FAR knows how to do so," and he cited FAR subpart 8.4, which expressly exempts FAR Part 8 FSS procurements from the Rule of Two requirements.  *Id.* The indefinite delivery contract regulations in FAR subpart 16.5, however, do no such thing.  *Id.* Judge Solomson concluded "in the context of the facts of this case, this [c]ourt has jurisdiction based upon an 'alleged violation of statute or regulation in connection with a procurement or a proposed procurement[,]' 28 U.S.C. § 1491(b)(1)[, and] the FASA task order bar does not pose a jurisdictional hurdle to [p]laintiffs' . . . Rule of Two arguments."  *Id.* at 80.

## E.  Whether the FASA Task Order Bar Precludes the Court From Exercising Jurisdiction

As Judge Firestone stated in *22nd Century*, "[t]he FASA task order bar does not preclude this court from exercising jurisdiction in every protest involving a task order."  *Id.* at 157.  For example, several courts have exercised bid protest jurisdiction despite FASA's task order bar where the procuring agency decides to cancel a solicitation and then procure the same services through the issuance of a task order.  *See, e.g.*, *BayFirst*, 104 Fed. Cl. at 498, 507–08; *MORI Assocs.*, 102 Fed. Cl. at 510, 525; *Tolliver*, 151 Fed. Cl. at 93–94; *see also supra* Section IV.D. The Federal Circuit affirmed Judge Firestone's decision characterizing the cases as "distinguishable."  *22nd Century Techs., Inc. v. United States*, 157 Fed. Cl. 152, 158 (2021), *aff'd,* 57 F.4th 993 (Fed. Cir. 2023).  At oral argument, however, the government characterized *22nd Century* and *SRA* as "really broad" and "clearly demarcating the FASA bar as being absolute and eliminating judicial review."  Tr. at 94:6–95:1.  The government concludes a footnote in *22nd Century*[11] overrules *Tolliver*—saying "*Tolliver* is a 'dead letter'"—and, by extension, *MORI*.  Tr. at 97:25–98:3, 92:21–25, 85:1–16, 87:12–23.  The government also notes *BayFirst*, after *SRA*, is "no good."  Tr. at 93:12–24.  In essence, the government contends *22nd Century* and *SRA* overturn all cases implicating a task order in any facet where this court found jurisdiction.  *See* Tr. at 93:24–94:5 ("[THE GOVERNMENT]: . . . The exception follows the rule.  The rule is task orders are unreviewable, and now you have got *Tolliver* and *Mori* that say, well, they actually are reviewable.  You just have to do the review at an earlier step.  But essentially, every task order then becomes reviewable, and that runs clearly counter to the intent of FASA.").

The Court can reconcile, as Judge Firestone did, *BayFirst*, *MORI*, and *Tolliver* because "the relevant agencies cancelled solicitations and proposed to procure or procured the services under a different procurement vehicle involving task orders."  *22nd Century Techs., Inc. v. United States*, 157 Fed. Cl. 152, 158–59 (2021), *aff'd,* 57 F.4th 993 (Fed. Cir. 2023) ("[D]ecisions [arising] during a stage of the procurement process that was logically distinct from the issuance or proposed issuance of any individual task order, such that FASA's bar was

---

[11] In a footnote, the Federal Circuit disagreed with 22nd Century's reliance on *Tolliver* for the proposition "FASA does not necessarily reach bid protests brought under the third prong of § 1491(b)(1), relating to 'action[s] . . . objecting to . . . any alleged violation of statute or regulation in connection with a procurement or proposed procurement.'"  *22nd Century Techs.*, 57 F.4th 993, 999 n.3 (Fed. Cir. 2023).  The Circuit clarified "[t]his argument is foreclosed by *SRA International*, which held that FASA reached protests brought under § 1491(b)(1)—including those brought under the final prong—as long as the protests are 'in connection with the issuance or proposed issuance of a task or delivery order.'"  *Id.* (citing *SRA Int'l*, 766 F.3d at 1413).

inapplicable.") (citing *MORI Assocs.*, 102 Fed. Cl. at 533–34 (holding the challenge to the lawfulness of the replacement procurement method, claiming the agency failed to comply with the "Rule of Two," was within the court's jurisdiction despite FASA); *Tolliver*, 151 Fed. Cl. at 93–94 (same); *BayFirst*, 104 Fed. Cl. at 507–08 (holding the cancellation decision was within the court's jurisdiction despite FASA)). In determining whether FASA's bar applies, the court evaluates the "connectedness of each challenged procurement decision to the issuance or proposed issuance of a task order." *BayFirst*, 104 Fed. Cl. at 503. *BayFirst* confirmed a cancellation decision can be "a discrete procurement decision and one which could have been the subject of a separate protest." *Id.* at 507. In *MORI* and *Tolliver*, the protest was about small business set-aside regulations—where the outcome of the Rule of Two analysis was not determinative of the type of contract vehicle—whereas, in *SRA International*, the protest focused on whether an organizational conflict of interest waiver necessitated an amended task order, and the size determination in *22nd Century* necessarily implicated a task order's lack of requirement bidders recertify as small businesses. In this case, the government and defendant-intervenor do not dispute the Court has jurisdiction over the agency's cancellation decision. Tr. at 100:21–102:7. Following the reasoning of *MORI* and *Tolliver*, neither the Rule of Two analysis nor the commercial preference evaluation necessarily results in a task order, so the FASA task bar is not applicable. "Not every decision that precedes the selection of a task order vehicle is so bound up with the proposed issuance of a task order that a protest of the decision would be prohibited by FASA." *MORI Assocs.*, 113 Fed. Cl. at 38.

The government presented *SRA* as "instructive for the point that when there's a causal connection to the issuance of a task order, as is here, . . . *SRA* says the FASA bar is pretty clear and categorical." Tr. at 71:25–72:5. If there is a causal relationship between two things, one thing is responsible for causing the other thing. *See* "Causal Connection," *Merriam-Webster Dictionary* (11th ed. 2021). The government, however, explained "[t]he Rule of Two could have come up when [we] were determining *whether* to issue . . . the IDIQ[,]" bolstering the notion one thing—the Rule of Two—is *not* responsible for causing the other thing—the IDIQ task order. Tr. at 62:11–12 (emphasis added). The Federal Circuit cautioned while "nothing in FASA's language *automatically exempts* actions that are temporally disconnected from the issuance of a task order[,] . . . *a temporal disconnect may, in some circumstances, help to support the non-application of the FASA bar.*" *SRA Int'l*, 766 F.3d at 1413 (emphasis added). In this case, plaintiff's respective complaints may be read as contending the agency's failure to follow the Rule of Two and commercial preference analyses (1) renders any solicitation arbitrary and capricious, and/or (2) independently violated FAR 19.502-2(b), FAR Part 10, and FAR Part 11. As the government clarified, the "potential procurement vehicles that an agency could select from depending on a Rule of Two analysis" include "issu[ing] a solicitation[;] go[ing] against the federal supply schedule[;] negotiat[ing] procurements[; and implementing] government-wide acquisition[s]." Tr. at 73:11–13, 20–23. Despite the "whole world of procurement vehicles" viable after a Rule of Two analysis, the government maintains "once [an] IDIQ is issued, the FASA bar applies." Tr. at 62:13. It cannot be the Court of Federal Claims must discard a case if the agency—even at the final hour—uproots its previous procurement plan in favor of a TOPR. The Court presented a hypothetical to underscore the unreasonable argument the issuance of a task order automatically strips the Court of jurisdiction:

[A]n agency issues a competitive solicitation in which a small business alleges two

organizational conflicts of interest ("OCIs") present: "impaired objectivity" and "unequal access to information." In light of the OCI allegations, the procuring agency decided to cancel the competitive solicitation and resolicit as a TOPR where no small business is eligible to compete. In that instance, would the Court of Federal Claims have jurisdiction over the small business protest?

Tr. at 68:21–69:4. The government answered "[n]o" and maintained any Rule of Two analysis with respect to task orders are prohibited in the Court of Federal Claims. Tr. at 69:5. In *SRA*, the Federal Circuit ruled the Court of Federal Claims did not have jurisdiction to decide SRA's claims concerning the validity of the GSA's OCI waiver after awarding a task order because "nothing in FASA's plain language carves out an exception for discretionary agency actions." *SRA Int'l, Inc.*, 766 F.3d at 1403. Here, for jurisdictional purposes, plaintiff is not arguing with the agency's discretion regarding the outcome of the regulatory analyses, but the failure of the agency to conduct analyses in the first place. *SRA* is distinct from the facts of this case. *Id.* ("Here, neither the discretionary nature of the OCI waiver nor the temporal disconnect between it and the issuance of [a task order] removes it from FASA's purview.").

The government noted despite *22nd Century*'s "different posture"—making no mention of a protest related to selecting a task order—"it's instructive because [p]laintiff in that case tried to rely on this distinction between going with a task order vehicle and issuing a task order." Tr. at 84: 19–22. As mentioned *supra* Section IV.C, the Federal Circuit did not dispute this court's conclusion "the FASA bar does not preclude the Court from exercising jurisdiction in every protest involving a task order." *22nd Century Techs., Inc. v. United States*, 157 Fed. Cl. 152, 157 (2021), *aff'd,* 57 F.4th 993 (Fed. Cir. 2023). Plaintiff characterizes its claims as "challenging the procurement process through the task order." Tr. 17–22 ("[PLAINTIFF]: We are not objecting to the fact that they are using a task order. We are objecting to the fact that they are putting this work under an umbrella that only large businesses can use and that they are soliciting a developmental solution without complying with FASA and the Rule of Two."). In other words, even if the Court were to ignore the previous RFP and analyze the claims with solely the TOPR in mind, the claims would still survive because an agency "can look at the FAR" to confirm it "ha[s] to do the FASA and the Rule of Two analysis before [it] solicit[s] any acquisition." Tr. at 59:22–60:1, 107:12–14. The government agreed with plaintiff's characterization of its claims as non-TOPR related. Tr. 22:12–23:6. Plaintiff acknowledges "there are certain challenges to the [TOPR or] terms of the TOPR" that would be barred, including: "Deloitte didn't submit the best proposal[; the agency] couldn't pick Deloitte[;]" Deloitte "didn't satisfy the TOPR requirement[, meaning] Deloitte submitted an unacceptable solution[;]" "[i]f [plaintiff] disputed that Deloitte qualified for the award and then that got appealed to OHA somehow[;]" the agency "can't solicit a one-year contract; [it] can only do six months[;]" and the agency "ha[s] to do lowest price technically acceptable. [It] can't do best value" for the TOPR evaluation criteria. Tr. at 66:9–24. Plaintiff characterizes all the claims barred by FASA as "directly tied to the task order that Deloitte receives" or "directly challenged to the proposed issuance of the task order." Tr. at 66:17–18, 66:24–67:1. In this case, the Court must evaluate whether the Air Force's decisions challenged by mLINQS are directly connected to the task order or are "logically distinct" from it; if the decisions are "logically distinct," the FASA bar does not apply. *22nd Century Techs., Inc. v. United States*, 157 Fed. Cl. 152, 157 (2021), *aff'd,* 57 F.4th 993 (Fed. Cir. 2023) (quoting *MORI Assocs.*, 102 Fed. Cl. at 533–34). The Court holds plaintiff's claims related to the FASA

and FAR are "logically distinct" considering an agency's regulatory obligations are discrete from the type of procurement vehicle selected. *Id.*

### F.     Conclusion Regarding the FASA Task Order Bar

The type of procurement vehicle cannot dictate jurisdiction. Plaintiff's claims in the instant case are both conceptually and sufficiently "temporally disconnected from the issuance of a task order" to avoid it. *SRA Int'l*, 766 F.3d at 1413. mLINQS does not challenge: the terms of a solicitation; the issuance of a task order solicitation; or the award (or proposed award) of a task order. *See Validata Chem. Servs.*, 169 F. Supp. 3d at 78 (explaining where plaintiff "is not objecting 'to a [government] solicitation,' 'to a proposed award,' or to an actual 'award of a [government] contract,' . . . neither the first nor the second prong of ADRA's 'objecting to' test [((1) "to a solicitation by a Federal agency" or (2) "to a proposed award or the award of a contract")] is implicated") (citing 28 U.S.C. § 1491(b)(1)). The Court, accordingly, holds plaintiff's claims related to the FASA and FAR are "logically distinct" considering an agency has to review the regulations irrespective of the eventual procurement vehicle selected. *See 22nd Century Techs., Inc. v. United States*, 157 Fed. Cl. 152, 157 (2021), *aff'd*, 57 F.4th 993 (Fed. Cir. 2023); *see generally Garufi*, 238 F.3d at 1330–33 (describing the history of Court of Federal Claims' jurisdiction over bid protests).

### V.     The Parties' Cross-Motions for Judgment on the Administrative Record Regarding Whether the Agency Satisfied Its Rule of Two Obligations When It Declined to Set Aside the Procurement Based on the Results of Its Market Research and Its Firsthand Experience With mLINQS

### A.     The Parties' Arguments Regarding Whether the Agency Satisfied Its Rule of Two Obligations

mLINQS contends the Air Force failed to conduct a Rule of Two analysis, Pl.'s MJAR at 24–25, and any analysis of the market research was arbitrary and capricious, *id.* at 25–28. Specifically, mLINQS advances three arguments: (1) the Air Force needed to conduct a duplicate Rule of Two analysis; (2) the Air Force is not permitted to rely on its experience with mLINQS in adjudging the company not capable of performance; and (3) approval from the SBA was required to make a determination regarding mLINQS and to open the solicitation to large businesses. *Id.* at 24–30. mLINQS first argues the Air Force was required to conduct a second Rule of Two analysis before issuing the task order proposal request on the AFSTS contract. *Id.* at 24–25. mLINQS next argues "[b]y ignoring mLINQS's [sic] as a second small business competitor for purposes of the Rule of Two analysis, the Air Force acted arbitrarily and contrary to the plain language of the rule." *Id.* at 27. Specifically, mLINQS asserts: "the Agency [appears to] believe[] the Rule of Two only requires a set aside where the market research deems at least two small businesses to be 'fully capable' as opposed to 'tentatively capable' or 'not capable.' But the Rule of Two does not say anything about whether the agency preliminarily deems a potential small business offeror to be capable—tentatively or otherwise." *Id.* (internal citations omitted). Third, mLINQS further asserts that the agency "improperly deemed [it] non-responsible without referral to the SBA." Pl.'s MJAR at 28. Fourth, mLINQS claims the Air Force "arbitrarily dissolved the existing set-aside." *Id.* at 29.

The government asserts "mLINQS's contentions are belied by the administrative record." Gov't MTD/Cross-MJAR at 37.[12]  First, the government argues "the Air Force's extensive experience working with mLINQS software supports the Air Force's conclusion that mLINQS was not a capable offeror and did not offer the 'best scientific and technological sources consistent with the demands of the proposed acquisition.'" *Id.* at 38 (quoting FAR 19.502–2(b)(2)).  Second, the government maintains "prior to issuing the solicitation, the Air Force performed market research that culminated in a formal report that concluded that 'there were not two small business concerns capable of performing the contract and submitting acceptably priced offers [and that only] one small business was deemed fully capable.'" *Id.* at 39–40 (quoting AR at 981) (citing AR at 327–32, 333).  The government adds:  "[T]he Air Force received approval for its conclusion that a small-business set-aside was not appropriate from its Small Business Professional and Small Business Director, as well as from the [SBA]." *Id.* at 40 (citing AR at 334).  The government emphasizes "the Air Force conducted research sufficient for it to determine that only one small business would be capable, [so] it opted to use full and open competition procedures[,]" which is "all that the Rule of Two requires." *Id.* at 42 (citing AR at 333).  Third, regarding mLINQS's argument the Air Force was non-responsible without referral to the SBA, the government clarifies "[t]he contracting officer is required to make a responsibility determination pursuant to FAR § 9.503(b) *only after* bids are *received*[,]" and the Air Force cancelled the solicitation before any bids were received. *Id.* at 43 (citing AR at 629).  Finally, the government contends "the agency issued the solicitation as 'unrestricted' from the start[,]" so "[t]here was no 'existing set-aside' to dissolve."  Gov't MTD/Cross-MJAR (citing AR at 341).  The government argues "[a]t base, mLINQS's Rule of Two argument invites the Court to second-guess the Air Force's business judgment that—based on its market research and prior experience—only one capable small business was likely to submit a bid."  *Id.*  At oral argument, the government further asserted "[t]he Air Force's position is they don't need to do [a Rule of Two analysis] for task orders."  Tr. at 135:2–4; *see* Gov't Reply MJAR at 10 ("mLINQS provides no authority for the sweeping proposition that agencies must conduct a Rule of Two analysis every time they issue task orders under existing IDIQ contracts.").

The Court understands the parties' arguments to fall under three broad categories:  (1) whether "the Air Force conducted research sufficient for it to determine that only one small business would be capable," Gov't MTD/Cross-MJAR at 42; (2) whether the Air Force was required to conduct a second Rule of Two analysis before issuing the task order proposal request for the AFSTS contract, *compare* Pl.'s MJAR at 24 ("The record does not contain any indication that the Air Force made a Rule of Two determination before soliciting its PCS requirements through the AFSTS IDIQ . . . ."), *with*, Tr. at 134:22–135:1 ("THE COURT:  Does the record indicate anything related to the Air Force doing a Rule of Two discussion or anything before the task order?  . . . [THE GOVERNMENT]:  They didn't think they had to do it."); and (3) whether "the Air Force . . . rationally assess[ed] whether the Rule of Two required a set aside before . . . selecting the AFSTS IDIQ as a vehicle[,]" Pl.'s MJAR at 24.

---

[12] In its cross-MJAR, defendant-intervenor notes it "defers to the analysis of the merits set forth [by] the Agency."  Def.-Int's MTD/Cross-MJAR at 2.  Defendant-intervenor's briefs, therefore, includes arguments "exclusively on the issues of jurisdiction and relief." *Id.*  The "Parties' Arguments" portions of Sections V–VII, therefore, include only defendant-intervenor's arguments from oral argument, if any.

**B.      Rule of Two:  FAR 19.502**

The FAR establishes procedures for agencies to make small business set-aside determinations.  FAR 19.502–1 ("Requirements for setting aside acquisitions").  These regulations provide a "contracting officer shall set aside an individual acquisition or class of acquisitions for competition among small businesses when . . . [a]ssuring that a fair proportion of [g]overnment contracts in each industry category is placed with small business concerns; and the circumstances described in 19.502–2 [i.e., the so-called 'Rule of Two'] . . . exist."  *Id.* 19.502–1(a)(2).  The Rule of Two requires the "contracting officer shall set aside any acquisition over the simplified acquisition threshold for small business participation when there is a reasonable expectation that—(1) Offers will be obtained from at least two responsible small business concerns; and (2) Award will be made at fair market prices."  *Id.* 19.502–2(b).

A Rule of Two determination "not to set aside a solicitation for small business concerns is a matter of business judgment" that "must be upheld unless the Court finds the decision to be 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.'"  *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 738 (2007) (quoting 5 U.S.C. § 706(2)(A)).  The Rule of Two "does not mandate any particular method for assessing the availability of small business bidders."  *Mgmt. & Training Corp. v. United States*, 118 Fed. Cl. 155, 168 (2013).  An agency's Rule of Two decision "invokes 'highly deferential rational basis review.'"  *Res-Care, Inc. v. United States*, 735 F.3d 1384, 1390 (Fed. Cir. 2013) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1368–69 (Fed. Cir. 2009)).  All that is required is that an agency's decision be supported by a rational basis.  *Sigmatech, Inc. v. United States*, 135 Fed. Cl. 694, 709 (2018).

*MORI* and *Tolliver*, discussed *supra* Section IV.D, analyze an agency's Rule of Two review.  In *MORI*, Judge Wolski highlighted:

> [T]he Small Business Administration has taken the position that "the FAR requires an agency to consider the suitability of an upcoming requirement for performance by small business first, while conducting acquisition planning," and believed that "[i]f such planning reveals that the requirement should be set aside for small businesses . . . the procuring agency must then select a procurement vehicle consistent with the requirement for a set-aside."

*MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 530 (2011) (quoting *Datamaxx Grp., Inc.*, B-400582, 2008 WL 5397147, at *4 (Comp. Gen. Dec. 18, 2008)).  He explained "[i]f an agency seeks to acquire services from a pool of offerors that has already been restricted—by being limited to multiple award task order contract holders, for instance—and this pool has no small businesses, the selection of the vehicle has made the Rule of Two analysis an empty gesture."  *Id.*  The government disputed neither "three small businesses . . . were competing to provide the agency's required Help Desk services as part of the IT Services Solicitation" nor "the agency had made the determination that the small businesses competing for a contract under the IT Services Solicitation could not provide the Help Desk services at fair market prices."  *Id.* at 554.  Judge Wolski determined "it is likely that, under the Rule of Two, the acquisition must be set aside for a small business award" given "the solicitation sought services that three small businesses were

competing to provide under another contract vehicle" and "the[] services [were previously] provided by . . . a small business." *Id.*  In *Tolliver*, Judge Solomson characterized the Rule of Two as "straightforward," providing "'[t]he contracting officer *shall* set aside *any acquisition* over the simplified acquisition threshold for small business participation when there is a reasonable expectation that—(1) Offers will be obtained from *at least two responsible small business concerns*; and (2) Award will be made at fair market prices.'"  *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 112 (2020) (quoting FAR 19.502–2(b) ("Total small business set-asides")).  He then analyzed each facet of the Rule of Two:

> (1) [t]he government's decision to procure the services at issue is itself part of an acquisition—the cancelled solicitations constitute part of that acquisition—and the agency's continued decision to procure those services is part of an acquisition (whether viewed as a continuation of the same acquisition, under a newly proposed strategy, or whether viewed as an entirely new acquisition)[; and] . . .
> (2) the government [does not] dispute that, in light of the acquisition history thus far, there are at least two responsible business concerns capable of performing the work at fair market prices, or that, in general, the Rule of Two is mandatory.

*Id.* at 112–13 (citing *Mgmt. & Training Corp. v. United States*, 115 Fed. Cl. 26, 44 n.13 (2014) ("[T]his court has consistently held that the Rule of Two is mandatory.")) (footnotes omitted). Judge Solomson confirmed "the Rule of Two unambiguously applies to any acquisition, FAR 19.502–2, without any loophole for MAIDIQ task orders."  *Id.* at 114 (cleaned up).  Judge Solomson ultimately held "the decision to move the work to the TMS MAIDIQ prior to conducting a Rule of Two analysis constitutes an independent violation of law."  *Id.* at 118.

## C.    Whether the Agency Satisfied Its Rule of Two Obligations

The Rule of Two in FAR 19.502–2(b) requires the CO to "set aside any acquisition over the simplified acquisition threshold[13] for small business participation when there is *a reasonable expectation*" of obtaining offers from at least *two responsible small businesses* at fair market prices.  FAR 19.502–2(b) (emphasis added).  The Air Force compiled market research in 2018 and 2021.  In 2018, the Air Force awarded mLINQS a sole-source contract[14] after utilizing

---

[13] The simplified acquisition threshold is currently $250,000, so both the RFP and task order meet the monetary threshold.  FAR 2.101; *see* AR at 145 (Independent Government Cost Estimate–RFP) (estimating the cost of the base year at $2,481,264.00), 742 (Independent Government Cost Estimate–Task Order) (estimating the cost of the base year at $2,443,464.00).

[14] Plaintiff argues "[t]he decision to move a scope of work previously set aside for small businesses to an IDIQ held only by large businesses constitutes the withdrawal of a small business set aside."  Pl.'s MJAR at 29.  The FAR mandates before withdrawing a "total or partial small business set aside," the CO must give "written notice to the agency small business specialist and the" Small Business Administration ("SBA") Procurement Center Representative and "prepare a written statement supporting any withdrawal or modification of a small business set-aside and include it in the contract file."  FAR 19.502–9(a), (c).  The September 2021 Small Business Coordination Record demonstrates the Air Force's research concludes a small-business set-aside was not appropriate for the PCS automation procurement, because only one capable small business responded to the agency's request for information.  AR at 333-34 (September 2021 Small Business Coordination Record).  The record confirms the Air Force properly withdrew the 2018 set-aside.  The requirement in this case, thus, is only applicable to the transition period between the 2018 sole-source contract and the 2021 RFP solicitation because the 2021 RFP solicitation was not a set-aside.  *See id.* (noting "the contracting officer may withdraw the small business set-aside"); AR at 341 (14

market research techniques, "Internet searches, Government Contacts, and reaching out to small businesses that have similar experience with th[e PCS] service." AR at 1–5 (26 July 2018 Market Research Report—Sole Source), 7–10 (Limited Sources Justification and Approval–Sole Source). After "g[iving] it a good try for three years[,]" the Air Force determined—based on its firsthand experience—mLINQS's offering was inadequate and conducted further market research. Tr. at 152:15–16; AR at 137 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS), 156 (29 June 2021 SAM.gov Posting—RFI), 882 (Air Force Memorandum for mLINQS "SUBJECT: Notice of the Government's Intent Not to Exercise Option Year 3"). In 2021, the Air Force accumulated its market research into a formal report, concluding "there were not two small business concerns capable of performing the contract and submitting acceptably priced offers [and that o]nly one small business was deemed fully capable." AR at 981 (20 September 2022 Agency Decision—mLINQS Protest); *see* AR at 327–32 (9 August 2021 Market Research Report), 333–34 (9 September 2021 Small Business Coordination Record). The same year, the Air Force received approval for its conclusion a small-business set-aside was not appropriate from its Small Business Professional and Small Business Director, as well as from the SBA. AR at 334 (9 September 2021 Small Business Coordination Record). In 2022, after the Air Force decided to "limit the scope" of the solicitation in the form of a TOPR, the agency "didn't conduct separate market research" following the 2021 Market Research Report. Tr. at 152:22–23 (the government); *see* AR at 327–32 (9 August 2021 Market Research Report). The Court, therefore, must analyze: (1) whether the 2021 Rule of Two analysis was rational; (2) whether a second Rule of Two analysis was required in 2022 before issuing the TOPR; and (3) if not, whether the 2021 Rule of Two analysis is applicable to the 2022 TOPR.

First, the Court addresses whether the 2021 Rule of Two analysis prior to issuing the RFP solicitation concluding mLINQS was "tentatively capable" was rational. In 2021, the Air Force determined only three companies could be considered "capable" of building a PCS automation solution able to meet its needs: two large businesses and one small business. *See* AR at 328–32 (9 August 2021 Market Research Report). Relying on its "past working history" with mLINQS's commercial software offering and responses from mLINQS's other customers, the Air Force concluded mLINQS was only "tentatively capable" of meeting the Air Force's requirements. AR at 328 (9 August 2021 Market Research Report). Over the course of three years, the Air Force documented its dissatisfaction with mLINQS's performance during its one-year sole source contract with four year-long option periods. *See* AR at 127–43 (2018 to 2021 Contractor Performance Assessment Reports—mLINQS), 90–94 (12 September 2018 Contract—Sole Source). For example, in assessing the base contract year beginning in September 2018, the reviewing CO observed although mLINQS had "started the efforts to meet the Air Force's operational needs[,]" it had "not been a smooth effort." AR at 128 (13 September 2018 to 12 September 2019 Contractor Performance Assessment Report—mLINQS). The CO noted, specifically, the mLINQS "system is lacking many functions and capabilities that were

---

October 2021 RFP) (issuing the solicitation as "unrestricted"); *see also* Tr. at 139:22–25 ("THE COURT: So, on the set-aside . . . the 2018 contract that mLINQS had, that was a set-aside, but that was not part of the 2021 RFP? [THE GOVERNMENT]: That's correct."), 142:19–21 ("THE COURT: . . . But[, plaintiff,] you would agree that the 2018 set-aside is not the 2021 RFP? [PLAINTIFF]: Yes."). As the 2018 set-aside was approved by the SBA, and the 2021 RFP was not a set-aside, the Court, accordingly, finds the Air Force did not violate the FAR's requirement governing an agency's withdrawal of an existing small business set aside in 2021. *See* FAR 19.502–9(a), (c).

thought to be already a part of the system." *Id.* (describing receiving "more push back than expected from the contractor when presented with the Air Force requirements" and concluding "this has been counterproductive in working to get the system fielded as soon as possible"). The assessments from the next two option years—beginning September 2019 and 2020—document mLINQS still "does not meet the Air Force's operational needs." AR at 132 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS), 137 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS). Further, the CO reported "disorganization and re-work" on mLINQS's part, AR at 138 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS), exacerbated the failure of the product to demonstrate a savings of cost or time for the Air Force, *see* AR at 137 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS). The Air Force remarked "[mLINQS] ha[d] not reached full capability in the 2+ years working with [the Air Force]." AR at 328 (9 August 2021 Market Research Report) (observing mLINQS "purports [to] support[] SFIS structure, but this has not been proven and is incomplete"). The Air Force did not exercise the remaining option years of mLINQS's sole-source contract. AR at 978 (20 September 2022 Agency Decision—mLINQS Protest), 882 (Air Force Memorandum for mLINQS "SUBJECT: Notice of the Government's Intent Not to Exercise Option Year 3").

The Air Force determined from its research a small-business set-aside was not appropriate for the PCS automation procurement, because only one capable small business responded to the agency's request for information. AR at 333–34 (9 September 2021 Small Business Coordination Record). Although the Air Force designated mLINQS as "tentatively capable," the record documenting the Air Force's continued engagement with mLINQS as a sole-source provider contextualizes the label of "tentatively capable" to read "not capable of the meeting requirement"; for example, the Air Force reported while mLINQS "purport[ed] supporting SFIS structure, . . . this has not been proven and is incomplete." *See* AR at 127–43 (2018 to 2021 Contractor Performance Assessment Reports—mLINQS), 328 (assessing mLINQS as "tentatively capable," in part, because it "has not reached full capability in the 2+ years working with [the Air Force]"). The pertinent statute builds discretion into the CO's evaluation process. When evaluating the applicability of the Rule of Two, the CO restricts competition only if he or she has a "reasonable expectation]" that two or more SDVOSBs will submit offers at a "fair and reasonable price" with the end of obtaining the "best value" for the federal government. 38 U.S.C. § 8127(d); *Benchmade Knife*, 79 Fed. Cl. at 737–38 (evaluating a related Rule of Two set out in FAR 19.502–2(b) and describing the determination of the applicability of the rule as a "business judgment within the contracting officer's discretion"); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine . . . [what] represents the best value for the government."). The Court may not "substitute its judgment for that of the agency" but instead looks to see if an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U. S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see also Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085–86 (Fed. Cir. 2001). In this inquiry, the Court does not second-guess the decisions being reviewed but looks at the "why" of the decision. *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 462 (2010) (Wolski, J.); *Tech Sys., Inc. v. United States*,

98 Fed. Cl. 228, 247 (2011) (Wolski, J.).  "This involves verifying that objective elements contained in the agency's analysis . . . correspond to the evidence in the record and checking to see if subjective judgments are reached elsewhere in the analysis that contradict the evaluators' conclusions making the decision too 'implausible.'"  *USfalcon, Inc.*, 92 Fed. Cl. at 462 (internal citations omitted).  The FAR specifically instructs "[t]otal small business set-asides shall not be made unless such a reasonable expectation exists."  FAR 19.502–2(b)(2).  Additionally, the agency must have "a reasonable expectation of obtaining from small businesses the best scientific and technological sources consistent with the demands of the proposed acquisition for the best mix of cost, performances, and schedules."  *Id.*  The FAR specifically contemplates utilizing "past acquisition history and market research" in determining whether a reasonable expectation exists.  *Id.*  The Air Force's extensive experience working with mLINQS's software supports the Air Force's conclusion mLINQS was not a capable offeror and did not offer the "best scientific and technological sources consistent with the demands of the proposed acquisition."  *See id.*  The Court determines the Air Force's 2021 Rule of Two analysis was rational, especially considering the decision "invokes 'highly deferential rational basis review.'"  *Res-Care*, 735 F.3d at 1390 (quoting *Weeks Marine*, 575 F.3d at 1368–69).

　　　　Second, the Court evaluates the necessity of a 2022 Rule of Two analysis before the issuance of the TOPR.  With neither a statutory timing requirement[15] nor binding precedent regarding whether the Rule of Two is required before issuing a task order,[16]  the Court attempts

---

[15] At oral argument, the government argued the 2021 Rule of Two analysis was still "fresh" given it was conducted within 18 months of issuing the task order.  Tr. at 140:1–7 ("THE COURT:  The 2021 RFP was its own thing that had the Rule of Two analysis completed?  [THE GOVERNMENT]:  Yes.  THE COURT:  And then that was still 18 months fresh going into the task order to the extent that it was required?  [THE GOVERNMENT]:  Yes."). Although the Rule of Two analysis and the Commercial Preference analysis are separate reviews, FAR 10.002, which applies to the latter analysis, *see infra* Section VI.B, allows an agency to utilize market research conducted "within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant" to determine if commercial or non-developmental products are available to meet the government's needs. FAR 10.002(b), (b)(1).  FAR 10.002(b)(1)(vii) references the section of the FAR governing the Rule of Two analysis, but the inverse is not true.  *See also* Tr. at 134:14-21 ("THE COURT:  Any case law that covers this provision of the 18 months good enough and a Rule of Two not being stale?  [THE GOVERNMENT]:  I have not come across that in my research, but that's sort of the minutia of the procurement process, that it's generally given deference by the Court to the agency and the contracting officer.  So, we'd fall back on those general principles."). *Compare* FAR 19.502, *with*, FAR 10.002.  It is not clear whether the 18-month provision in the Commercial Preference analysis applies to the Rule of Two analysis, and there is no apparent caselaw to corroborate the government's argument furnished in its cross-MJAR and oral argument:  "Under the FAR, . . . a contracting officer may use market research that was 'conducted within 18 months' prior to award for the purpose of making a set-aside determination."  Gov't's MTD/Cross-MJAR at 14 (quoting FAR 10.002(b)(1)).  While 18 months as an indication of a "current" Rule of Two analysis is a fair assumption given the market research timeline in the commercial preference realm, its statutory application to the Rule of Two analysis is tenuous.  *See* Tr. at 123:15–17 ("[THE GOVERNMENT]:  I believe a Rule of Two analysis has a time component, so it's still considered current if it's within 18 months, is my recollection.").

[16]  The Court notes on 1 March 2022, General Counsel for Procurement Law of the SBA, John W. Klein, issued an update on the agency's regulatory agenda at the Small Business & Other Socioeconomic Programs Committee of the American Bar Association Public Contract Law Section.  *See Subcontracting, Teaming and Strategic Alliances & Small Business and Other Socioeconomic Programs Joint Committee Meeting:  Small Business Subcontracting Plans:  Best Practices for Drafting and Implementing Them*, ABA (Mar. 1, 2022), https://www.americanbar.org/groups/public_contract_law/committees/small-bus/meetings/ [hereinafter ABA Meeting].  Of note, Klein shared the SBA is in the process of preparing a rule change to codify Judge Solomson's holding in *Tolliver*; in other words, the rule change would require agencies to conduct the Rule of Two analysis before deciding to issue a task order.  *See id.*; *Tolliver*, 151 Fed. Cl. at 114–115 (holding "when deciding the

to reconcile *MORI* and *Tolliver*, discussed *supra* Section V.B, to determine whether a second Rule of Two analysis was required in this case after the Air Force's 2021 conclusion.[17]  *MORI* decided "[t]here is nothing in [FAR] 19.502–2(b) to suggest that the Rule of Two set-aside decision must be made at the time an indefinite solicitation, such as those for multiple award ID/IQ contracts, is written and issued."  102 Fed. Cl. at 533.  *Tolliver* held "an agency must apply the Rule of Two *before* an agency can even identify the possible universe of procurement vehicles which may be utilized for a particular scope of work."  151 Fed. Cl. at 104.  *MORI* concludes an agency is not required to conduct the Rule of Two analysis "at the time [a task order] is written and issued[,]" and *Tolliver* maintains the analysis is a pre-requisite for determining a task order is an appropriate procurement vehicle.  102 Fed. Cl. at 533; 151 Fed. Cl. at 104.  In this case, the agency "conducted market research . . . [and b]ased on this market research, . . . determined that there were not two small business concerns capable of performing the contract and submitting acceptably priced offers."  AR at 981 (20 September 2022 Agency Decision—mLINQS Protest) (noting "[o]nly one small business was deemed fully capable").  The market research included reports documenting mLINQS "does not meet the Air Force's operational needs" during its sole-source performance over the course of three years.  *E.g.*, AR at 132 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS).  As *Tolliver* notes,

> [w]here an agency refuses to perform the Rule of Two analysis or otherwise disregards the results of such an analysis, that does not mean an agency necessarily *will* select an unrestricted vehicle or a task order vehicle.  Indeed, the agency still may solicit the work utilizing procurement vehicles that have nothing to do with task orders (*e.g.*, a standalone solicitation contemplating a single awardee but that is not set-aside for small business).

---

foundational, prerequisite question of what type of procurement vehicle to use for a planned acquisition (*i.e.*, to satisfy a particular agency need)" an agency may not "avoid the Rule of Two merely because a [task order] already has been awarded and the agency prefers to use that vehicle").  The rule is currently undergoing interagency review but is likely to be proposed sometime this year.  *See* ABA Meeting; *see also* Tom Temin, *The SBA moves to resolve a vexing wrinkle in the Rule of Two*, Fed. News Network (Feb. 23, 2023, 1:25 PM), https://federalnewsnetwork.com/acquisition-policy/2023/02/the-sba-moves-to-resolve-a-vexing-wrinkle-in-the-rule-of-two/.

[17] *Compare ITility, LLC*, B-419167, 2020 CPD ¶ 412, 2020 WL 7863819, at *12 (Comp. Gen. Dec. 23, 2020) (reiterating "set-aside determinations under multiple-award contracts are discretionary, not mandatory"), *with*, *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 114 (2020) (cleaned up) (determining "the Rule of Two unambiguously applies to any acquisition . . . without any loophole for MAIDIQ task orders").  In *ITility*, the Government Accountability Office ("GAO") reviewed the issuance of a task order by the Department of Homeland Security for program management and information technology support for the Financial Systems Modernization office.  *ITility, LLC*, 2020 WL 7863819, at *1.  The GAO noted that it had in the past construed the small business Rule of Two as applicable to any task order delivery order solicitation, but that in 2010 Congress amended the Small Business Act to require rules allowing federal agencies to "set aside orders placed against multiple award contracts for small business concerns" "at their discretion."  *Id.* at *9.  Both the FAR and SBA rules echoed the language allowing agencies to have discretion in setting aside orders for small business.  *Id.*  In various decisions, the GAO had consistently ruled that "set-aside determinations under multiple-award contracts are discretionary, not mandatory."  *Id.* at *12.  In keeping with that tradition, the GAO reiterated that agencies do not have to use small business set-asides for orders solicited against multiple award contracts.  *Id.*  The GAO in *ITility* arrived at a different conclusion than *Tolliver*.  In *Tolliver*, Judge Solomson held agencies cannot simply move a requirement to a multiple award contract and get around the Rule of Two.  *See Tolliver Grp., Inc.*, 151 Fed. Cl. at 117.

*Tolliver*, 151 Fed. Cl. at 104. As *Tolliver* articulates, the Rule of Two analysis does not necessarily result in a task order, and the Air Force here conducted the Rule of Two analysis in 2021 to determine the "possible universe of procurement vehicles." *Id.* The Air Force originally determined a solicitation under full and open competition procedures was appropriate, AR at 333 (9 September 2021 Small Business Coordination Record), but then transferred the requirements to its existing AFSTS IDIQ contract, AR at 745 (18 August 2022 Request Form—Task Order). *See infra* Section VII.C (explaining agency rationale in cancelling the original competitive solicitation). The statute does not specify timing or documentation of a Rule of Two analysis regarding an acquisition, and the procurement officer is "entitled to exercise discretion upon a broad range of issues confronting [her]." *Garufi*, 238 F.3d at 1332, 1333 (quotations omitted); *see Veteran Shredding, LLC v. United* States, 146 Fed. Cl. 543, 578–80 (2019), *aff'd*, 842 F. App'x 606 (Fed. Cir. 2021) (holding the CO's actions, grounded in market research and the agency's requirements, were not arbitrary or capricious). The Court, accordingly, finds if the agency conducted the Rule of Two analysis in 2021 and determined not only setting the solicitation aside for small businesses was not viable but also different vehicles were appropriate, then the agency can rely on the same analysis to transition to a different procurement vehicle within the pre-determined "possible universe" in 2022 without conducting a separate, redundant analysis. *Tolliver*, 151 Fed. Cl. at 104. Additionally, the Air Force's ongoing contract engagement with one-of-two small business offerors supports the agency's decision. *See Veteran Shredding*, 842 F. App'x at 609 (finding the agency "did not simply reissue the solicitation without again looking into the appropriateness of a set-aside[; r]ather, it conducted multiple rounds of market research"); *Res-Care*, 735 F.3d at 1390 (quoting *Weeks Marine*, 575 F.3d at 1368–69) (An agency's Rule of Two decision "invokes 'highly deferential rational basis review.'").

Third, the Court reviews whether the scope of the 2021 Rule of Two analysis covers the 2022 TOPR solicitation. For the Court to make that determination, it must first compare the solicitations to ascertain whether the ambits of the RFP and TOPR overlap. At oral argument, the government and plaintiff agreed the RFP and TOPR are "similar enough." *See* Tr. at 134:7–9 ("[THE GOVERNMENT]: To the extent that the agency would have to conduct market research for the TOPR, [the RFP is] similar enough."), 105:6–7 ("[PLAINTIFF]: . . . [The TOPR is] the exact same thing, just shrunk down to a subset of [the RFP]."). Plaintiff specifically "agree[d] with [the government's] characterization that [the TOPR] is a subset of the requirements. It is a shorter period of performance." Tr. at 104:23–25. The "General," "Background," and "Scope Descriptions of Services" sections for the RFP and the TOPR are nearly identical. For example, the desired functional capabilities overlap, such as a "self-vouchering tool that allows travelers to submit actual (realized) travel data and input all necessary allowance claims," AR at 436 (RFP "Functional Capabilities," Section 2.2.1), 757 (TOPR "Functional Capabilities"), and an "[a]pplication will provide capability to reflect commercial airfare ticket price ('TR cost') in an automated fashion per traveler (sponsor, dependents) on the Order for all [Outside the Continental United States ('OCONUS')] travel for allowance cap settlement computation and traveler awareness[,]" AR at 438 (RFP "Functional Capabilities," Section 2.2.31), 758 (TOPR "Functional Capabilities"). The Court finds the 2021 Rule of Two analysis is applicable to the 2022 TOPR considering the latter is a truncated version of the RFP. *See* FAR 19.502–2(b)(2) (noting "past acquisition history and market research of an item or similar items are always important"). The span of a year does not render the first Rule of Two analysis moot when the

procurement scope is "similar enough."[18]  Tr. at 134:7–9; *see* Tr. at 105:6–7.  At oral argument, plaintiff objected to the notion the agency used its 2021 Rule of Two analysis to inform its TOPR decision because there is no evidence in the record.  *See* Tr. at 121:5–7.  The government agreed there is no evidence the CO referred to the 2021 Rule of Two analysis before issuing the TOPR but asserted there is:  (1) no evidence to the contrary; and (2) a presumption of regularity.  Tr. at 123:6–11, 154:1–10 ("[THE GOVERNMENT]:  . . . [T]he Air Force . . . contracting personnel . . . have a knowledge of the CPARS.  They have the knowledge of the market research.  They have nothing to indicate that they disregarded that prior history. . . .  [T]he presumption of regularity presumed that agency personnel do their jobs."); *see Sickels v. Shinseki*, 643 F.3d 1362, 1366 (Fed. Cir. 2011) (quotations omitted) ("[T]he presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties.").  A Rule of Two determination "not to set aside a solicitation for small business concerns is a matter of business judgment" that "must be upheld unless the Court finds the decision to be 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.'"  *Benchmade Knife*, 79 Fed. Cl. at 738 (quoting 5 U.S.C. § 706(2)(A)).  Although there is no affirmative evidence the CO used the 2021 Rule of Two analysis before issuing the TOPR, there is no evidence to the contrary showing the CO did not use the research.  *See Sickels*, 643 F.3d at 1366.  Additionally, the FAR does not contain a provision necessitating specific written documentation for a Rule of Two analysis.  *See* FAR 19.502–2.  The Court agrees there is no record confirming the CO definitively used the 2021 Rule of Two analysis in 2022; however, market research documenting reviews during mLINQS's sole-source contract as well as the 2021 Rule of Two analysis demonstrate mLINQS is not capable.  *See Garufi*, 238 F.3d at 1338 ("Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.").

### D.    Conclusion Regarding Whether the Agency Satisfied Its Rule of Two Obligations

The Court finds:  (1) the 2021 Rule of Two analysis was rational; and (2) a second Rule of Two analysis was not required in this case because (3) the 2021 Rule of Two analysis was sufficient in scope to cover both the 2021 RFP and the 2022 TOPR.  The Air Force worked extensively with mLINQS during the years 2016–21 as a sole-source provider and determined it had "not reached full capability," AR at 328 (9 August 2021 Market Research Report); therefore, the Air Force was justified in not setting the procurement aside for mLINQS as a FAR 19.502–2 small business.  *See* AR at 127–43 (2018 to 2021 Contractor Performance Assessment

---

[18] On 30 June 2022, acknowledging there was "no active procurement at this time," mLINQS emailed CO Ross and sought to meet with the Air Force to "provide an update on key developments that will greatly benefit the Air Force."  AR at 697 (30 July 2022 Email Correspondence).  This email does not provide details on the "update."  *See id.*  The Court finds mLINQS's purported "updates" are speculative and do not alter the Rule of Two analysis.  *See Garufi*, 238 F.3d at 1338 ("Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious."); *Gregory Lumber Co. v. United States*, 11 Cl. Ct. 489, 501 (1986), *aff'd*, 831 F.2d 305 (Fed. Cir. 1987), *cert. denied,* 484 U.S. 1061 (1988) (finding mere bland inferences or unsubstantiated speculation are not enough to induce this court to abandon "the long-accepted presumption that public officials act in good faith, and with integrity in the performance of their duties").

Reports—mLINQS).  The presumption of regularity also weighs in favor of determining the
2021 Rule of Two analysis is adequate for informing the 2022 TOPR selection.  *See Sickels*, 643
F.3d at 1366.  A Rule of Two analysis is required "before an agency can even identify the
possible universe of procurement vehicles which may be utilized for a particular scope of work."
*Tolliver*, 151 Fed. Cl. at 104.  The Rule of Two, therefore, is required before issuing a task order,
but there are no provisions governing documentation or analysis time requirements.
Additionally, the TOPR and RFP solicitations are "similar enough" where the Rule of Two
analysis before the RFP is sufficient to carry over to the TOPR under FAR 10.001(a).  Tr. at
134:7–9; *see* Tr. at 105:6–7.  Considering the Air Force's ongoing relationship with mLINQS as
well as the market research, the agency was not arbitrary in its categorization of mLINQS as "not
capable" and was, thus, rational in not conducting a duplicate Rule of Two analysis before the
2022 TOPR.  *See Garufi*, 238 F.3d at 1333 ("[T]he contracting agency provided a coherent and
reasonable explanation of its exercise of discretion.").

## VI.    The Parties' Cross-Motions for Judgment on the Administrative Record Regarding Whether the Agency Satisfied Its Market Research and Acquisition Planning Obligations to Accommodate Commercial Products

### A.    The Parties' Arguments Regarding Whether the Agency Satisfied Its Obligations to Accommodate Commercial Products

Plaintiff argues under FAR Part 11, "[n]ot only must the agency define its requirements
to encourage commercial products in the first instance, but it must also '[m]odify requirements in
appropriate cases to ensure the requirements can be met by commercial products or commercial
services or . . . non[-]developmental items.'"  Pl.'s MJAR at 32 (quoting FAR 11.002(a)(2)(v))
(emphasis omitted); *see* FAR 11.002(a)(2)(ii)–(iii).  Plaintiff asserts "the Agency does not
recognize, much less take any action, to further its obligation to prioritize commercial and
non-developmental solutions over 'ground up development.'"  Pl.'s MJAR at 32.  Plaintiff
highlights a lack of indication in the record "the Air Force ever considered whether it could
define its PCS requirements to better accommodate existing commercial and non-developmental
solutions, as FASA and the FAR expressly require.  Indeed, after cancelling the RFP, the Air
Force doubled-down and specifically solicited a developmental approach."  *Id.* at 33.  Plaintiff
contends "under the plain terms of the TOPR, the Air Force exclusively seeks the development
of a new, custom PCS solution, without any consideration of whether existing commercial or
non-developmental solutions are available that either (A) already meet the Air Force's needs, (B)
could be modified to meet the Air Force's needs, or 'could meet the agency's requirements if
those requirements were modified to a reasonable extent.'"  *Id.* (citing 10 U.S.C. § 3453(c)(2);
FAR 10.001(a)(2)(v), (a)(3)(ii)).

The government contends "mLINQS's interpretation of FASA's language, which would
require the Air Force to proceed with commercial software that it tested for three years and
rejected as inadequate, stretches Congress's language beyond the breaking point."  Gov't's
MTD/Cross-MJAR at 45.  In support of this contention, the government argues plaintiff "ignores
the Air Force's years of experience with a COTS item[,] [a]nd it runs counter to even mLINQS's
own documentation, which indicated that a COTS solution was not workable and that the Air
Force has 'unique needs' that would require mLINQS 'to make changes' to its off-the-shelf

product." *Id.* at 44 (quoting AR at 134 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS)).  The government clarifies "[i]mportantly, FASA does not include—and mLINQS is careful not to assert—a mandate for agencies to procure commercial products or services.  Procuring agencies therefore retain significant procurement discretion under FASA." *Id.* (citing Pl.'s MJAR at 30–32; *Analytical Graphics, Inc. v. United States*, 135 Fed. Cl. 378, 429 (2017) ("[T]he court does not wish to be in the position to tell . . . any agency how they must procure any item, commercial or otherwise.")).  The government highlights "[e]ven the word 'maximum' in the statute and its implementing regulations is accompanied each time by the modifier 'practicable.'" *Id.*  Additionally, the government asserts "the Air Force conducted extensive market research, including issuing several requests for information and analyzing the capabilities of commercial software, including mLINQS." *Id.* at 46 (citing *Analytical Graphics*, 135 Fed. Cl. at 384–85, 388, 427 (determining, based on market research, no commercially available requirement satisfied the agency's requirements, which necessitated a non-commercial solution)).  The government contends because "the Air Force was 'deliberate' and 'candid' about potential commercial options and their downsides, and conducted 'through and complete market research,' this [c]ourt should defer 'to the government's view that there was no commercially available product' meeting the agency's requirements." *Id.* (quoting *Analytical Graphics*, 135 Fed. Cl. at 433, 435).

### B.    FASA and FAR Parts 10 and 11:  Preference for Commercial Products

Agencies are required to conduct market research and structure acquisitions to accommodate commercial and non-developmental solutions before choosing a contract vehicle or issuing a solicitation.  *See* 10 U.S.C. § 3453(c)(2); FAR 10.002(c); FAR 11.002(a)(2).  FASA established a preference for the government to procure commercial products and services rather than government-unique products and services.  FASA's statutory directives are implemented in the FAR through a host of market research and acquisition planning requirements.  FAR 11.002(a)(2)(iii) specifically links these market research and acquisition planning activities to the types of companies the agency must permit to compete.

### 1.    FASA:  41 U.S.C. § 3307 and 10 U.S.C. § 3453

Through the FASA, Congress mandates agencies "shall ensure that, to the maximum extent practicable . . . requirements are defined so that commercial services or commercial products or . . . non[-]developmental items other than commercial products, may be procured to fulfill such requirements" and "acquire commercial services, commercial products, or non[-]developmental items other than commercial products to meet the needs of the agency."  10 U.S.C. §§ 3453(a)(2), (b)(1).  FASA requires agencies to use market research to determine whether commercial or non-developmental items are available that either (A) already meet their needs, (B) could be modified to meet their needs, or (C) "could meet the agency's requirements if those requirements were modified to a reasonable extent." *Id.* § 3453(c)(2).  FASA contemplates agencies will modify their own requirements to accommodate commercial and non-developmental solutions rather than engage in developmental work to meet their requirements "in appropriate cases."  *See also id.* § 3453(b)(3) (directing agencies to "modify requirements in appropriate cases to ensure that the requirements can be met by" commercial and non-developmental solutions).

### 2.    *Palantir USG, Inc. v. United States*

In support of its argument, plaintiff refers to one Federal Circuit case—*Palantir*; the Court, accordingly, recounts the analysis in *Palantir* to determine if it is analogous to the instant procurement. *See* Pl.'s MJAR at 34–35 (citing *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018)).  Before summarizing the Federal Circuit's analysis in the case, the Court will provide the relevant factual background.

In 2014, the Army decided to modernize its intelligence software system.  *Palantir*, 904 F.3d at 984–85.  In July 2014, the Army chartered an independent "Market Study" to "provide situational awareness and market trends to the Army leadership of the 'state-of-the-practice' within the commercial . . . software platform landscape."  *Id.* (quotations omitted).  A not-for-profit research and development organization assessed three acquisition approaches:  (i) developmental; (ii) commercial; and (iii) hybrid (integrating aspects of both developmental and commercial items).  *See id.*  The organization recommended a hybrid approach, utilizing two COTS components as a basis for the new system.  *Id.* at 986.  The Army subsequently issued three RFIs on August 2014, December 2014, and May 2015.  *Id.* at 987.  The protester, Palantir, objected to two of the RFIs, claiming the requests focused on information pertaining to the development of a new system rather than to existing software capabilities like Palantir's product. *Id.*  Palantir also noted other Department of Defense personnel requested Palantir's data management platform documented in three "Operational Needs Statements."  *See Palantir*, 904 F.3d at 992.  In July 2015, the Army issued a "Trade Space Analysis" to "inform the economic analysis and RFP for [the new software system] and analyze[] the following options:  COTS, Government-off-the-Shelf ('GOTS'), and hybrid."  *Id.* at 987.  The analysis concluded "a hybrid COTS-development approach was the best of the three alternatives, noting that such an approach was currently functioning in the Department of Defense Intelligence Community and would only require minor development to fill capability gaps."  *Id.*  On 13 July 2015, shortly after circulating the "Trade Space Analysis," the Army published a "Market Research Report" concluding the opposite—the development could not be procured as a commercial product.  *Id.*  The report "also stated, without any explanation, analysis, or support, that significant portions of the anticipated [] scope of work are not available as a commercial product."  *Id.* (quotations omitted).  Two days later, on July 15, 2015, the Army issued a draft performance work statement, which Palantir objected to in October 2015, "asserting that the 'Army does not need to build that [data management] platform, as it can buy it today.'"  *Id.*  On 23 December 2015, the Army issued the solicitation contemplating "the award of a single indefinite-delivery, indefinite-quantity contract for [the new software system], with the simultaneous issuance of a cost-reimbursement type task order" and highlighting "the software design release/development should include 'maximization of reuse of GOTS/COTS products.'"  *Palantir*, 904 F.3d at 988.  Palantir filed a pre-award bid protest at the agency—which the GAO denied in May 2016—before filing its complaint in the Court of Federal Claims on 30 June 2016.  *Id.* at 989.

The Federal Circuit emphasized "the Army did not use the results of [its] market research to determine whether there were commercial items that could meet its requirements, could be modified to meet its requirements, or could meet its requirements if those requirements were modified to a reasonable extent."  *Id.* at 990–91 (citing 10 U.S.C. § 2377(c)(2), revised on 1 Jan.

2021 as 10 U.S.C. § 3453(c)(2)).  The Federal Circuit acknowledged "there is no statutory or regulatory requirement for agencies to document their determinations pertaining to § 2377 and FAR Part 10" but determined the Army failed to provide any discussion in the "Market Research Report" to support its "conclusory assessment" there were no commercially available products meeting its requirements.  *Id.* at 993–94 (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001) (citing Supreme Court decisions establishing, a court may order the agency to provide explanation if such an explanation is required for meaningful judicial review even if the agency is not obligated to provide reasons)).

### C.   Whether the Agency Satisfied Its Obligations to Accommodate Commercial Products

Under FASA, commercial products are preferred so long as they meet the specific government needs of the purchase order.  *See* 10 U.S.C. § 3453(c)(2).  Agencies, therefore, must conduct market research to determine whether commercial items are viable before procuring a product or service.[19]  FAR 10.002(c); FAR 11.002(a)(2).  Before issuing the TOPR, the Air

---

[19] Plaintiff argues "[t]here is nothing in the record evidencing that anyone 'determined' that the Air Force should 'consider options beyond commercial products.'"  Pl.'s Reply MJAR at 26.  The Air Force, however, considered commercial products in its market research, *see* AR at 328 (9 August 2021 Market Research Report), but determined it required a developmental approach to meets its "unique needs," *see* AR at 134 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS); thus, "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion."  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).  The Air Force identified two other commercial products in its 2021 Market Research Report were "capable," and the TOPR Statement of Objectives does not reject utilizing an existing commercial system to meet its requirements.  *See* AR at 328–29 (9 August 2021 Market Research Report), 752 (18 August 2022 TOPR Statement of Objectives); *see also Advanced Am. Constr., Inc. v. United States*, 111 Fed. Cl. 205, 227 (2013) ("[T]he language of [the FAR] . . . does not establish any mandatory documentation requirement.  [It] states that agencies 'should' document the results of their market research; it does not state that those agencies 'shall' do so.").  The FAR defines COTS as "a product . . . that is: of a type customarily used by the general public or by nongovernmental entities for purposes other than governmental purposes," and the Air Force has "unique needs."  FAR 2.101; AR at 134 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS).  In its market research here, just as in *Analytical Graphics*, "the Air Force was more deliberate and more candid about its commercial options than the Army in *Palantir*," noting in its 2021 Market Research Report commercial options were available.  *Analytical Graphics, Inc. v. United States*, 135 Fed. Cl. 378, 433 (2017) ("The Air Force's consideration of how to proceed with the procurement, therefore, cannot be said to have been casual, unthinking, or not deliberate, despite the absence of articulated, contemporaneous documentation."); *see* AR at 328 (9 August 2021 Market Research Report).  In *Palantir*, the Army violated FASA because it "focused on a developmental approach . . . *at an early point* in the procurement process, *to the exclusion* of commercially available alternatives."  *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 276 (2016), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018) (emphasis added).  Here, the Air Force attempted to implement mLINQS's commercial product for "2+ years" but had "unique needs" that required significant modifications.  *See* AR at 328 (9 August 2021 Market Research Report), 134 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS).  The Air Force revised its PCS Automation Performance Work Statement ("PWS") to allow for a competitive commercial solution only after determining mLINQS's COTS product was insufficient to meet its requirements.  *See* AR at 156 (29 June 2021 SAM.gov Posting—RFI); AR at 882 (Air Force Memorandum for mLINQS "SUBJECT: Notice of the Government's Intent Not to Exercise Option Year 3").  The Air Force ultimately determined while "two vendors are already in sustainment with a PCS solution," commercial products cannot meet the specific government needs of the purchase order.  AR at 328 (9 August 2021 Market Research Report); *see* 10 U.S.C. § 3453(c)(2).  While FASA's language encourages agencies to procure commercial products, the statute relaxes the requirement by noting "to the maximum extent practicable," *id.* § 3453(a)(2), "to a reasonable extent," *id.* § 3453(c)(2), and "in appropriate cases," *id.* §

Force conducted formal market research inquiries in 2016 and 2021. Beginning 2 August 2016, the Air Force completed 18 months of market research to find a PCS automation solution, including issuing requests for information, holding discussions with government subject-matter experts, and reviewing and evaluating relevant market information. AR at 1, 4–5 (26 July 2018 Market Research Report—Sole Source), 9 (2 August 2018 Limited Sources Justification and Approval—Sole Source). In 2018, the Air Force originally determined mLINQS provided a commercially available and potentially suitable PCS software solution. AR at 978 (20 September 2022 Agency Decision—mLINQS Protest) ("The Air Force originally sought to fulfill its requirement for PCS Automation by procuring moveLINQS as Software as a Service (SaaS) . . . COTS[] solution . . . ."). Despite moveLINQS "lacking many functions and capabilities that were thought to already be a part of the system[,]" the Air Force worked with mLINQS for three years as a sole-source provider. AR at 127–34 (13 September 2018 to 27 August 2020 Contractor Performance Assessment Reports—mLINQS). During the sole-source contract period—2018 through 2021—the Air Force issued three Contractor Performance Assessment Reports ("CPARs") documenting problems with mLINQS's software.[20] *See* AR at 127–30 (13 September 2018 to 12 September 2019 Contractor Performance Assessment Report—mLINQS), 131–35 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS), 136–43 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS). The first CPAR, addressing the year beginning in September 2018, noted "the system is lacking many functions and capabilities that were thought to be already a part of the system." AR at 128–29 (13 September 2018 to 12 September 2019 Contractor Performance Assessment Report—mLINQS). The next CPAR, for the option year beginning September 2019, observed "mLINQS still does not meet the Air Force's operational needs." AR at 132–33 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS). The final CPAR, evaluating the option year beginning September 2020, again stated mLINQS was not "meet[ing] the Air Force's operational needs" and "while the [mLINQS] system works as is for Federal Agencies, it cannot accommodate [the]

---

3453(b)(3), agencies should accommodate commercial items—and "[courts] give deference to the [agency's] procurement decisions." *Palantir*, 904 F.3d at 990; *see DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1310-11 (Fed. Cir. 2021) ("[C]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process," and "when a decision within the scope of that discretion is reasonable, a court may not substitute its judgment for that of the agency." (internal quotations omitted)).

[20] FAR 10.002(b)(1) provides the CO "may use market research conducted within 18 months before the award of any task or delivery order if the information is still current, accurate, and relevant." The Court notes not all the CPARs fall within the 18-month statutory period but recognizes the CPARs are iterative and provide insight into the Air Force's "past experience" with mLINQS. *See* FAR 10.002(b)(1) ("The extent of market research will vary, depending on such factors as . . . past experience."). Regarding the accuracy of the Air Force's market research conclusion on mLINQS's incapability, mLINQS acknowledged after three years of attempting to implement its COTS system, the system still "does not completely meet [the Air Force's] operational needs yet." AR at 139 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS), 328 (9 August 2021 Market Research Report) ("[mLINQS] has not reached full capability in the 2+ years working with [the Air Force]."). The Court finds the record supports the accuracy of the Air Force's market research. *See Palantir*, 904 F.3d at 993–94. On the issue of relevance, as discussed *supra* Section V.C, the parties agreed the RFP and TOPR are sufficiently similar. *See* Tr. at 134:7–9. "Relevant" means "closely connected or appropriate to the matter in hand," and the TOPR is a shorter period of performance but essentially procures the same scope of work. *See* "Relevant," Oxford Dictionary of English, (3d ed. 2010). The Court concludes the Air Force's market research, although originally intended for the RFP, is sufficiently relevant to satisfy the market research requirements for the TOPR. The Court, therefore, determines the Air Force's market research satisfies the requirements of FAR 10.002(b)(2) because it is current, accurate, and relevant.

Air Force[']s volume and does not include the functionality that would provide an adequate replacement in its current state for the other systems currently in use by [the] Air Force."  AR at 137 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS).

On 3 September 2021, the Air Force informed mLINQS it would not exercise the remaining option years of the sole-source contract given "during performance it became apparent to both the Air Force and mLINQS that the moveLINQS software could not fulfill the Air Force PCS Automation requirement without modifications."  AR at 978 (20 September 2022 Agency Decision—mLINQS Protest).  On 29 June 2021, the Air Force initiated market research through an RFI posted on SAM.gov to discover a different PCS automation solution.  AR at 156–62 (29 June 2021 SAM.gov Posting—RFI).  Of the 15 responses received, at least three of the respondents, including mLINQS, acknowledged the Air Force should consider a more developmental—as opposed to a COTS-based—solution.  *See* AR at 235 (RFI Industry Response Email—Kearney and Company), 243 (RFI Industry Response Email—KPMG), 314 (RFI Industry Response Email—mLINQS) (footnote omitted) ("mLINQS understands [the Air Force] desires change from the current 'COTS' approach including:  1.  a dedicated code line for the [Air Force], which will lead to 2.  faster, more agile development with more frequent releases tailored to [the Air Force's] needs.").  In arguing the Air Force failed to comply with the "mandatory market research and acquisition planning requirements of FASA and the FAR[,]" plaintiff analogizes the case to *Palantir*, claiming "[t]he Air Force's failure to engage with its market research and acquisition planning obligations before soliciting development of a bespoke, Air Force-edition PCS solution must be set aside for the same fundamental reasons that this [c]ourt and the Federal Circuit recognized in *Palantir*, where the record revealed that the Army pursued a developmental approach without satisfying its obligations under FASA and the FAR to consider whether existing commercial solutions were available."  Pl.'s MJAR at 34 (citing *Palantir*, 129 Fed. Cl. at 266–69).  The Court, accordingly, analyzes *Palantir* in connection with the facts of in this case.

Plaintiff contends, "[a]s in *Palantir*, on this record there is no basis to conclude that the Air Force satisfied its market research and acquisition planning obligations under FASA and the FAR."  Pl.'s MJAR at 35.  Unlike in *Palantir*, however, the record here does not indicate the Air Force failed to "rationally use its market research results" in determining commercial preference for a developmental solution.  *Palantir*, 904 F.3d at 994.  In *Palantir*, the Circuit found the Army failed to provide any discussion in the Market Research Report to support their "conclusory assessment" stating there were no commercially available products meeting their requirements.  *Id.* at 993.  Here, the Air Force's decision to seek a developmental solution is supported by the both the 2021 Market Research Report and the CPARs, which document ongoing issues in utilizing mLINQS's COTS system.  *See* AR at 328 (9 August 2021 Market Research Report) (stating mLINQS "has not reached full capability in the 2+ years working with [the Air Force]"), 137 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS) (noting mLINQS's software was still not "meet[ing] the Air Force's operational needs."); *see also* AR at 128–30 (13 September 2018 to 12 September 2019 Contractor Performance Assessment Report—mLINQS) (noting mLINQS's software is not functional and "has required much configuration and enhancement"), 132–34 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS) (noting the

mLINQS software was "lacking capabilities" and "not an adequate replacement").  Unlike in *Palantir*, where the Army was on notice of a potential COTS system that could fulfill its requirements but failed to address the system, the Air Force specifically notes mLINQS "has not reached full capability in the 2+ years working with [the Air Force]." [21]  AR at 328 (9 August 2021 Market Research Report); *see Palantir*, 904 F.3d at 994; AR at 137 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS), 128–30 (13 September 2018 to 12 September 2019 Contractor Performance Assessment Report—mLINQS), 132–34 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS).  After working with mLINQS for "2+ years," the Air Force extensively documented its familiarity with mLINQS's COTS product and its limitations prior to soliciting a developmental solution—the record here does not show the Air Force failed to "rationally use its market research results" in determining commercial preference for a developmental solution.  AR at 328 (9 August 2021 Market Research Report); *Palantir*, 904 F.3d at 994; *see Garufi*, 238 F.3d at 1332 ("When a challenge is brought on the first ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process.").

Turning to *Palantir*'s analysis of the FAR's documentation requirement, plaintiff argues there is nothing in the record explicitly documenting the Air Force's determination to solicit a developmental approach.  Pl.'s MJAR at 35.  The Air Force, however, did not have a "statutory or regulatory requirement . . . to document their determinations."  *Palantir*, 904 F.3d at 993–94; *see Advanced Am. Constr., Inc. v. United States*, 111 Fed. Cl. 205, 227 (2013) ("[T]he language of [the FAR] . . . does not establish any mandatory documentation requirement.  [It] states that agencies 'should' document the results of their market research; it does not state that those agencies 'shall' do so.");  Tr. at 155:13–16 ("[THE GOVERNMENT]:  . . . There is not a specific form that the agency has to fill out to say that we have done this market research, here it is, and with a neat little bow.  It would be nice if we have that.").  The FAR explicitly states "[t]he extent of market research will vary, depending on such factors as . . . past experience."  FAR 10.002(b)(1).  Here, the Air Force has extensive and well-documented "past experience" with mLINQS.  *See* AR at 127–43 (2018 to 2021 Contractor Performance Assessment Reports—mLINQS).  Plaintiff does not argue there is any indication in the record the Air Force failed to reference its market research results; rather, plaintiff merely underscores the absence of

---

[21] Unlike the Army in *Palantir*, the Air Force in this procurement "use[d] the results of [its] market research to determine whether there were commercial items."  *Compare Palantir*, 904 F.3d at 990–91, *with*, AR at 328 (9 August 2021 Market Research Report).  The Air Force broadened its search only after mLINQS's software proved inadequate. AR at 2 (26 July 2018 Market Research Report—Sole Source), 132 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS), 137 (19 September 2020 to 18 September 2021 Contractor Performance Assessment Report—mLINQS), 156 (29 June 2021 SAM.gov Posting—RFI).  The Air Force's market research in June and July of 2021 "document[ed] multiple commercial systems which could be leveraged[, and n]owhere does the TOPR Statement of Objectives (SOO) abandon the concept of using a modified existing commercial system to meet its requirements."  AR at 979 (20 September 2022 Agency Decision—mLINQS Protest).  Contrary to mLINQS's present claims, "the Air Force gathered information from various sources about the capabilities of existing commercial solutions, and incorporated feedback from industry to revise its PCS Automation Performance Work Statement (PWS) to allow for a competitive commercial solution."  *Id.*  The Air Force's market research, including the assessments of mLINQS's commercial software proving inadequate to meet the Air Force's "unique needs" and the "2021 Market Research Report," informed the agency's conclusion a developmental product was more suitable for the Air Force's "unique needs."  AR at 134 (13 September 2019 to 27 August 2020 Contractor Performance Assessment Report—mLINQS), 327 (9 August 2021 Market Research Report).

documentation in the record the Air Force used its market research. *See* Pl.'s MJAR at 35 ("[T]here is nothing in the record to suggest that 'the [Air Force] had seriously considered whether' an existing commercial or non-developmental solution was available . . . ." (quoting *Palantir*, 129 Fed. Cl. at 271 (2016))); Tr. at 121:5–7 ("[PLAINTIFF]:  There is no evidence that Contracting Officer Hill ever looked at the market research . . . ."), 125:23–24 ("[PLAINTIFF]: The [Air Force] *may* use [the market research].  There's no evidence that they did use it.") (emphasis added).  The record suggests the opposite—the Air Force was fundamentally involved in understanding mLINQS's product.  *See* AR at 127–43 (2018 to 2021 Contractor Performance Assessment Reports—mLINQS).  For multiple years, the Air Force attempted to implement mLINQS's COTS product and became thoroughly acquainted with moveLINQS's shortcomings. *See* AR at 127–43 (2018 to 2021 Contractor Performance Assessment Reports—mLINQS).  As the Federal Circuit noted in *Palantir*, "[courts] give deference to the [agency's] procurement decisions." *Palantir*, 904 F.3d at 990; *see* Tr. at 151:16–19 ("[THE GOVERNMENT]:  The FASA doesn't require the Air Force to keep bending over backwards year after year to try to meet its needs with a product that doesn't fit its needs.").  The Court—with no evidence to the contrary—presumes the CO properly discharged her duty to consider market research in determining to procure a developmental solution as required by FAR 10.001(a)(2).  *See Gregory Lumber Co. v. United States*, 11 Cl. Ct. 489, 501 (1986) (citations omitted) (There is "the long-accepted presumption that public officials act in good faith, and with integrity in the performance of their duties."), *aff'd*, 831 F.2d 305 (Fed. Cir. 1987), *cert. denied,* 484 U.S. 1061 (1988); *Miley v. Principi*, 366 F.3d 1343, 1347 (Fed. Cir. 2004) ("The presumption of regularity provides that, in the absence of clear evidence to the contrary, the court will presume that public officers have properly discharged their official duties.").

### D.    Conclusion Regarding Whether the Agency Satisfied Its Obligations to Accommodate Commercial Products

Although FASA requires the procuring agency to seek a commercial solution to the maximum extent practicable, it does not mandate the use of a COTS item.  FASA requires the government procure commercial products so long as they meet the agency's needs.  *See* 10 U.S.C. § 3453(c)(2).  In implementing FASA's commercial preference policy, the FAR obligates agencies to conduct market research to determine whether commercial items are viable before procuring a product or service.  FAR 10.002(c); FAR 11.002(a)(2).  The Air Force and mLINQS worked together for three years before "it became apparent to both the Air Force and mLINQS that the moveLINQS software could not fulfill the Air Force PCS Automation requirement without modifications."  AR at 978 (20 September 2022 Agency Decision—mLINQS Protest). The ongoing relationship between the agency and mLINQS's COTS software—coupled with the Air Force's two formal market research inquiries—supports the conclusion a COTS product was not suitable for the Air Force's "unique needs."  AR at 127 (13 September 2018 to 12 September 2019 Contractor Performance Assessment Report—mLINQS), 1, 4–5 (26 July 2018 Market Research Report—Sole Source), 9 (2 August 2018 Limited Sources Justification and Approval— Sole Source), 156–62 (29 June 2021 SAM.gov Posting—RFI).  The Court, accordingly, holds the Air Force satisfied its obligation under the FASA and the FAR to accommodate commercial solutions to the maximum extent practicable.  *See Garufi*, 238 F.3d at 1332 ("[A] bid award may be set aside if . . . the procurement procedure involved a violation of regulation or procedure.").

**VII.    Whether the Agency's Cancellation of the RFP Solicitation to Pursue a
Developmental End-to-End Process Through a TOPR During a PIA Investigation
Was Arbitrary, Unlawful, and Fundamentally Unfair**

> **A.    The Parties' Arguments Regarding Whether the Agency's Cancellation of
> the RFP Solicitation Was Arbitrary and Capricious**

Plaintiff challenges the agency's decision to cancel the solicitation.  Pl.'s MJAR at
17–24.  Plaintiff contends the cancellation was arbitrary and capricious because the Air Force
failed to provide a rational basis for the cancellation.  *Id.* at 17–20.  Plaintiff further argues the
agency failed to document the cancellation decision, *id.*, the Air Force lacked authority for the
decision, *id.* at 20–21, and the cancellation was "fundamentally unfair," *id.* at 21–24.  First,
plaintiff asserts the Air Force's investigation into allegations of a PIA violation was an
insufficient reason to cancel the solicitation.  *Id.* at 18–19.  Second, plaintiff faults the Air Force
for choosing to cancel, rather than suspend, the solicitation.  Pl.'s MJAR at 19–20 (emphasizing
"[a]gency counsel recommended suspension").  Third, plaintiff argues there "is no obvious
rational connection between (i) legal advice to suspend the [solicitation] pending a PIA
investigation and (ii) outright cancelling the [solicitation] months before the PIA investigation is
completed."  *Id.* at 19.  Plaintiff adds:  the CO's reference to a change in licensing requirements
as an additional reason for the cancellation is similarly not rationally connected to the
cancellation.  *Id.* at 20.  Fourth, plaintiff takes issue with the Air Force's documentation of the
cancellation.  *Id.* at 18–19.  Fifth, plaintiff asserts the Air Force lacked authority for the
cancellation.  *Id.* at 20–21 (citing *Seventh Dimension, LLC v. United States*, 161 Fed. Cl. 110,
116–18 (2022)).  Sixth, plaintiff argues the cancellation was "arbitrary and fundamentally
unfair."  *Id.* at 21–24.  The crux of plaintiff's final argument is the unfairness of the Air Force
improperly releasing Kearney's pricing data and then excluding the team of Kearney and
plaintiff from competing for the subsequent procurement because it was issued as a task order
under the AFSTS contract.  Pl.'s MJAR at 21–24.  Plaintiff contends "'cancellation does nothing
to remedy the improper disclosure.'"  *Id.* at 23 (quoting *SAGAM Securite Senegal v. United
States*, 154 Fed. Cl. 653, 664 (2021)).  "It cannot be that an agency can improperly release
information to the disadvantage of one team of competitors and then remedy that violation by
excluding the disadvantaged team from further competition."  *Id.*

The government argues mLINQS's contentions lack merit.  First, the government
provides "[t]he Federal Circuit has held that where 'the record discloses a reasonable motivation
for cancellation,' the cancellation will be upheld."  Gov't's MTD/Cross-MJAR at 31 (quoting
*Veterans Contracting Grp., Inc. v. United States*, 920 F.3d 801, 806 (Fed. Cir. 2019)).  The
government furnishes an example where "a cancellation may occur even 'after bids have been
opened'; although this is 'generally disfavored,' the agency may take this action if 'there is a
compelling reason to reject all bids and cancel the invitation.'"  *Id*. (citing *Veterans Contracting*,
920 F.3d at 806; *Veteran Shredding, LLC v. United States*, 842 F. App'x 606, 608 (Fed. Cir.
2021) (collecting cases and concluding "excessively high bids [can] provide a 'compelling
reason' to cancel a solicitation," even one that was "initially set aside under the Rule of Two")).
Second, the government highlights "the record amply establishes—and mLINQS does not
dispute—that it was impossible to suspend the solicitation on the SAM.gov website."  *Id.* at
32–33 (citing AR at 661).  At oral argument, the government highlighted the legal

recommendation to suspend and the agency's decision to cancel as both achieving "not going forward with the award during the pendency of the [PIA] investigation." Tr. at 161:11–16 ("[THE GOVERNMENT]: . . . [L]egal recommended not going forward with the award during the pendency of the investigation due to the Kearney complaint.  It couldn't be suspended.  It could have been dragged out and extended, but it could have just as easily been cancelled, and the agency chose to cancel."), 161:2–4 ("[THE GOVERNMENT]: . . . [L]egal recommended suspension, but that just means the procurement came before with PIA investigation kind of hanging overhead.").  Third, the government emphasizes "the rational connection has to be between the cancellation and the agency's rationale for it; not between the agency's rationale and some other non-feasible choice based on erroneous 'legal advice.'"  Gov't MTD/Cross-MJAR at 34 (citing *Veterans Contracting*, 920 F.3d at 806 (concluding the protester "has not shown that the contracting officer lacked any rational basis for cancelling the [solicitation where] the record discloses a reasonable motivation for cancellation")).  The government contends the "looming PIA investigation was a 'reasonable motivation' for the cancellation."  *Id.*  The government adds: "Nor is there any 'indication that this reason was a mere pretext to cover an improper motivation.'"  *Id.* (quoting *Veterans Contracting*, 920 F.3d at 806).  The government further emphasizes "changed requirements may well provide a compelling reason to cancel an existing solicitation."  *Id.* (citing *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 128–29 (2010) (concluding "[n]othing in the language of FAR 15.206(e) . . . precludes the cancellation of a solicitation in response to . . . modest changes in a procuring agency's requirements, nor does this subsection otherwise exhaust the circumstances under which the contracting officer is *permitted* to cancel a negotiated procurement")).  Fourth, "mLINQS does not identify a FAR provision that requires any particular form of documentation by the agency."  *Id.* at 35.  Fifth, the government maintains "the record documents an investigation into allegations of a PIA violation, as well as a secondary rationale concerning modified requirements."  *Id.* (citing AR at 661–62).  Sixth, the government emphasizes "to the extent that Kearney's pricing data was disclosed, it is Kearney that should be the party making this argument[, y]et . . . Kearney is absent from this protest."  Gov't MTD/Cross-MJAR at 36.  The government further contends "the Air Force's decision to procure a subset of the work through the AFSTS contract is not unfair to mLINQS because it is unrelated to the agency's cancellation decision."  *Id.* at 37.  The government maintains:

> [T]he Air Force remedied the improper disclosure with an investigation and a certification requirement; the cancellation was never intended as a *remedy* for the disclosure.  Indeed, to the extent that Kearney was harmed by the inadvertent disclosure of its pricing data, mLINQS's attempt to move forward with a tainted solicitation would only *exacerbate* the harm to Kearney.  mLINQS contends that the "improper release of Kearney's pricing data put the mLINQS and Kearney team at a disadvantage under the [solicitation]," Pl.'s MJAR at 23, but, at the same time, mLINQS seeks to revive that very solicitation by seeking to undo the cancellation.

*Id.* (footnote omitted).

## B.   APA Standard of Review

When this court evaluates a bid protest, "the inquiry is whether the agency's action was

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013); *see also Sys. Application & Techs., Inc., v. United States*, 100 Fed. Cl. 687, 711 (2011), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012). Arbitrary and capricious means "the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U. S. 29, 43 (1983)) (cleaned up).

Two Federal Circuit cases exemplify the necessity of agency rationale. In *Parcel 49C*, plaintiff met its burden of proof by showing the government had "no rational basis" for cancelling a solicitation. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994). It introduced overwhelming evidence the rationale offered by the agency for cancellation was "merely a pretext for accommodating [the agency]'s displeasure with the selection of Parcel 49C." *Id.* at 1151. In *Veterans Contracting Group*, the Circuit found, unlike the plaintiff in *Parcel 49C*, Veterans Contracting Group, Inc. did not show the CO lacked any rational basis for cancelling a solicitation set aside for SDVOSBs. *Veterans Contracting*, 920 F.3d at 806. The only two acceptable bids proposed costs significantly higher than the government's estimate for the project. *Id.* at 807. The Circuit held the CO rationally determined the prices were unreasonable, and he had a compelling reason to request cancellation. *Id.*

## C.   Whether the Agency's Cancellation of the RFP Solicitation Was Arbitrary and Capricious

The burden on the Air Force is to provide a record of the rationale for the cancellation decision, so the Court may determine if this record provides "a coherent and reasonable explanation of [the Air Force's] exercise of discretion." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004). The administrative record provides two reasons the Air Force cancelled the RFP solicitation: (1) a PIA investigation; and (2) changing requirements. *See* AR at 695 (23 June 2022 Correspondence re: PCS Modernization Contract), 661 (Investigation Questions with Contracting Officers and Federal Service Help Desk). With a pending PIA investigation, the Air Force's "[l]egal [department] recommended a suspension of the solicitation due to the Kearney complaint." AR at 661 (Investigation Questions with Contracting Officers and Federal Service Help Desk). CO Ross, however, "explained that a solicitation could not be suspended in SAM.GOV"; "there is not a button that you can click to suspend, because how long would you suspend it for?" AR at 661 (Investigation Questions with Contracting Officers and Federal Service Help Desk); Tr. at 161:8–10. A second reason was "adding licensure requirements so the effort is changing." AR at 661 (Investigation Questions with Contracting Officers and Federal Service Help Desk). In the "Questions & Answers" section of the RFP solicitation, the Air Force noted it "anticipates the requisite for licensing and subsequent licensing costs will vary based on technical proposals. Therefore, if needed, the licensing costs will be handled on a separate contract vehicle that is appropriate to support the type of licensing required." AR at 560 (Solicitation Questions & Answers). Considering review of a CO's decision to cancel is "extremely deferential," the agency's decision should not be

disturbed unless it is "wholly without reason." *Cygnus Corp. v. United States*, 72 Fed. Cl. 380, 384 (2006), *aff'd,* 227 F. App'x 909 (Fed. Cir. 2007).

First, the government documents the PIA investigation as a reason for cancellation. Where "the record discloses a reasonable motivation for cancellation[,]" the cancellation will be upheld. *Veterans Contracting*, 920 F.3d at 806. For instance, a cancellation may occur even "after bids have been opened"; although this is "generally disfavored," the agency may take this action if "there is a compelling reason to reject all bids and cancel the invitation." *Id.*; FAR 14.404–1(a)(1); *see also Veteran Shredding*, 842 F. App'x at 608 (collecting cases and concluding "excessively high bids [can] provide a 'compelling reason' to cancel a solicitation[,]" even one that was "initially set aside under the Rule of Two"). The government noted the RFP solicitation "couldn't be suspended. It could have been dragged out and extended, but it could have just as easily been cancelled, and the agency chose to cancel." Tr. at 161:13–16. In other words, although the government could have extended the RFP deadline, the agency could not predict how long the PIA investigation would endure. Cancelling the solicitation before receipt of bids results in the least harm. Tr. at 166:12–14 ("[THE GOVERNMENT]: . . . When there's been . . . no harm because there have been no bids submitted, there's no limit on the agency to cancel it."), 160:15–23 ("[THE GOVERNMENT]: . . . There had been no bids submitted, so this is not a case where there are sealed bids that have been opened or anything like that where there have been proposals submitted. This is very early on in the RFP process. Literally [agency personnel] put out the solicitation and some amendments and then they're pulling it back. . . . [T]he agency decided that cancellation in light of the PIA investigation was the rational course."); *see Veterans Contracting*, 920 F.3d at 806 (holding a cancellation may occur even "after bids have been opened"). The FAR provides broadly "[t]he source selection authority may reject all proposals received in response to a solicitation, if doing so is in the best interest of the [g]overnment." FAR 15.305(b). This court has previously found a rational basis for cancellation is sufficient to establish a procuring agency's compliance with FAR 15.305(b). *See, e.g.*, *DCMS-ISA, Inc. v. United States*, 84 Fed. Cl. 501, 513–14 (2008). The cancellation occurred before bids had been received, which results in less harm to the offerors and agency. Tr. at 166:12–14 ("When there's been . . . no harm because there have been no bids submitted, there's no limit on the agency to cancel it."). Accordingly, where, as here, the agency "provided a coherent and reasonable explanation of its exercise of discretion," *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001), articulating "'a rational connection between the facts found and the choice made,'" *Cygnus*, 72 Fed. Cl. at 385 (quoting *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 358 (2004)), the cancellation decision must be found to have been proper. *Garufi,* 238 F.3d at 1332.

Plaintiff argues there "is no obvious rational connection between (i) legal advice to suspend the [solicitation] pending a PIA investigation and (ii) outright cancelling the [solicitation] months before the PIA investigation is completed." Pl.'s MJAR at 19. The nexus, however, must be between the agency's rationale and the cancellation—not the Air Force's legal department recommendation and the cancellation. *See Veterans Contracting*, 920 F.3d at 806 (concluding the protester "has not shown that the contracting officer lacked any rational basis for cancelling the [solicitation where] the record discloses a reasonable motivation for cancellation"). Although the agency could have made different decisions following the PIA investigation notice, cancellation was a viable option. "It is axiomatic that the demonstrated

rationality of one possible conclusion does not negate the rationality of the alternative or even opposite conclusion. After all, reasonable minds can and do differ." *Madison Servs.*, 92 Fed. Cl. at 128; *see DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1310–11 (Fed. Cir. 2021) ("[C]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process[,]" and "when a decision within the scope of that discretion is reasonable[,] a court may not substitute its judgment for that of the agency." (quotations omitted)); *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." (quotations omitted)).

The parties present different cancellation caselaw. Plaintiff presents *SAGAM* to underscore the FAR's express requirements the government treat contractors fairly during the procurement process. Tr. at 169:17–170:2. In *SAGAM*, a government official violated the PIA and other FAR provisions by revealing SAGAM's cost and pricing data during discussion with the only other offeror in the competitive range. *See* 154 Fed. Cl. at 658–68. To avoid the consequences of the PIA violation, the agency chose to cancel the procurement and resolicit, inviting both companies to compete again. *See id.* Judge Sweeney found the cancellation irrational, in large part because the agency: (1) failed to consider the fundamental unfairness of improperly releasing one competitor's proprietary information to another; (2) attempted to remedy the situation through cancellation and re-solicitation; (3) asked both parties to start over; and (4) did nothing to remedy the harm done to the victim of the agency's improper actions. *See id.* at 669. This case is distinguishable from *SAGAM* because the PIA violation occurred before the Air Force received any bids, whereas *SAGAM*'s PIA violation transpired after they received bids. Additionally, the Air Force's cancellation here resulted in far less damage—at the least because bids had not been received (unlike in *SAGAM*). The Air Force also furnished a secondary rationale for cancellation coupled with the PIA investigation: the agency wanted to change the solicitation requirements. AR at 661 (Investigation Questions with Contracting Officers and Federal Service Help Desk). The government presented *Veterans Contracting* and *Rex Service* as examples of upheld cancellations. Tr. at 166:7–16, 167:4–11. The Federal Circuit in *Veterans Contracting* affirmed the Court of Federal Claims' finding the agency's cancellation of the SDVOSB set-aside contract was proper. *See Veterans Contracting*, 920 F.3d at 806–07. The Circuit noted the protester had "not shown that the contracting officer lacked any rational basis for cancelling" the solicitation. *See id.* at 806. The court also explained "[t]he only two acceptable bids" received by the Department of Veterans Affairs "proposed costs significantly higher than the government's estimate for the project. Thus, the contracting officer rationally determined that these prices were unreasonable. Under the circumstances, he had a compelling reason to request cancellation." *Id.* at 807. Similarly, the plaintiff in *Rex Service* filed an agency protest to an RFP in which it alleged the Department of Defense disclosed the plaintiff's proprietary information and sought to exclude from the competition any company that utilized its information. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1306–07 (Fed. Cir. 2006). The agency's alleged violations did not prevent plaintiff from submitting a proposal, but plaintiff did not do so. *See id.* at 1307. After reviewing the RFP, the department concluded no data contained in it was proprietary but, nevertheless, it cancelled the solicitation. *Id.* The Circuit summarized the case: "In the end, [the plaintiff] did not submit a bid; nor did it file a timely bid protest in the Court of Federal Claims, in which it established that it expected to bid

prior to the close of the solicitation period, but was prevented from doing so on the basis of improper agency action." *Id.* (citing *MCI Telecoms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989)). Together, *Veterans Contracting* and *Rex Service* show the cancellation of the RFP in this case is warranted considering: (1) bids had not been received when the agency decided to add license requirements, resulting in less harm to the potential offers and the agency; (2) cancellation is a plausible outcome of a PIA investigation; and (3) the procurement officer is "entitled to exercise discretion upon a broad range of issues confronting [her]." *Garufi*, 238 F.3d at 1333 (quotations omitted).

Second, the government references a change in licensing requirements as another rationale for cancellation. In issuing the TOPR, "the mission partner revised the requirement to include licensures that were not in the initial solicitation." AR at 662 (Investigation Questions with Contracting Officers and Federal Service Help Desk). An agency's "failure to state needs adequately in a solicitation, such that a significant modification to the contract would be required if the agency's needs were to be met during performance, is a 'compelling reason' to cancel a solicitation." *Vanguard Sec. Inc. v. United States*, 20 Cl. Ct. 90, 109 (1990) (collecting cases). Changed requirements may well provide a compelling reason to cancel an existing solicitation. *See Madison Servs.*, 92 Fed. Cl. at 128–29 (concluding "[n]othing in the language of FAR 15.206(e) . . . precludes the cancellation of a solicitation in response to . . . modest changes in a procuring agency's requirements, nor does this subsection otherwise exhaust the circumstances under which the contracting officer is *permitted* to cancel a negotiated procurement"). The Air Force's "need to reassess its requirement, which was articulated at the time of the cancellation, is a reasonable basis for cancelling" the solicitation. *Shields Enters., Inc. v. United States*, 28 Fed. Cl. 615, 636 (1993); *see Garufi*, 238 F.3d at 1332.

Plaintiff also argues the Air Force lacked authority for the cancellation, relying on *Seventh Dimension*. For a competitive Department of Defense acquisition such as the RFP, Title 10 generally requires an agency make an award once a Solicitation is issued, absent some authority to cancel or reject all proposals. *See Seventh Dimension*, 161 Fed. Cl. at 116–18 (analyzing 10 U.S.C. §§ 3301(b), 3301(c)). The court concluded the Army's solicitation cancellation decision was arbitrary, capricious, and contrary to law because the CO made only "conclusory assertions regarding the need for cancelling the [s]olicitation" and "did not apply or address the [cardinal change] considerations in any detail." *Id.* at 118 (quotations omitted). The court added the "government before this [c]ourt point[ed] to no facts in the administrative record justifying the Army's cancellation of the [s]olicitation pursuant to FAR 15.206(e)." *Id.* (quotations omitted). *Seventh Dimension* is not directly applicable to the case at hand because it concerned a cancellation pursuant to FAR 15.206(e), for which "the contracting officer must make a 'judgment' that a proposed solicitation amendment would both constitute a cardinal change, and that cancellation (and resolicitation) would result in increased competition for the procurement" and that judgment "must be based on market research or otherwise." *Id.* at 117. Additionally, the administrative record in *Seventh Dimension* "contained no market research to justify the cancellation of the procurement . . . [and] no other evidence sufficient to support the cancellation of the solicitation pursuant to FAR 15.206(e)." *Id.* Here, by contrast, the record documents an investigation into allegations of a PIA violation, as well as an additional rationale concerning modified requirements. AR at 661–62 (Investigation Questions with Contracting Officers and Federal Service Help Desk). Faced with an indeterminate duration of the

investigation and the possibility the solicitation would need to be modified based on the outcome of the investigation, the agency reasonably decided cancellation was the better course of action. *See Shields Enters., Inc.*, 28 Fed. Cl. at 636 (citing *Am. Gen. Leasing, Inc v. United States*, 587 F.2d 54, 58–59 (Ct. Cl. 1978)) (detailing a "procurement official's decision to cancel a solicitation is inherently discretionary"); *Garufi,* 238 F.3d at 1332.

### D.   Conclusion Regarding Whether the Agency's Cancellation of the RFP Solicitation Was Arbitrary and Capricious

"The arbitrary and capricious standard applicable here is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). Not only was the agency uncertain of the timeline of the PIA investigation but also the result could have been cancellation; cancelling before receipt of bids results in the least damage. Tr. at 174:18–25; *see Veterans Contracting*, 920 F.3d at 806 (holding a cancellation may occur even "after bids have been opened"). An agency also has deference when "the effort is changing," including imposing new license requirements. AR at 661*; see Input/Output Tech., Inc. v. United States*, 44 Fed. Cl. 65, 72 n.9 (1999) ("[T]his court's role is not to second guess what the [procuring agency] has determined to be its needs."); *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (citing *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1300 (Fed. Cir. 1999)) ("This court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law."). The government's cancellation of the RFP solicitation was therefore not arbitrary, capricious, or fundamentally unfair. *See Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp.*, 419 U.S. at 285).

## VIII.   Plaintiff's Requests for Declaratory and Injunctive Relief

Plaintiff requests declaratory relief, restoration of the status quo ante before cancellation,[22] and an injunction to enforce legal obligations. Pl.'s MJAR at 36–37. Declaratory relief "permits the court . . . to define the legal relationships and adjust the attendant rights and obligations at issue between the parties so as to avoid the dispute escalating into additional wrongful conduct" but also "avert[s] greater damages and multiple actions and collateral issues involving not only the original litigants but potentially other third parties." *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 405 (S.D.N.Y. 2002), *aff'd,* 346 F.3d 357 (2d Cir. 2003). The Court does not find the Air Force acted irrationally, arbitrarily, capriciously, or abused its discretion. *See supra* Section VII.D. As such, the Court denies plaintiff's requested declaratory judgment. *See* Pl.'s MJAR at 37.

The Court considers the following factors when determining whether to issue a permanent injunction: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief;

---

[22] The Court does not find remand necessary, so Section VIII does not address the parties' arguments regarding whether remand with or without *vacatur* is appropriate.

and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  According to the first factor, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits.  The Court therefore does not consider the remaining factors and denies plaintiff's request.  *See Info. Tech. & Apps. Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001) ("Absent success on the merits, the other factors are irrelevant."), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).

## IX.    Conclusion

For the foregoing reasons, the Court:  (1) **DENIES** plaintiff's motion for judgment on the administrative record, ECF No. 24; (2) **DENIES** defendant-intervenor's motion to dismiss, ECF No. 26; (3) **DENIES** the government's motion to dismiss, ECF No. 27; (4) **GRANTS** the government's cross-motion for judgment on the administrative record, ECF No. 27; (5) **GRANTS** defendant-intervenor's cross-motion for judgment on the administrative record, ECF No. 26; and (6) **FINDS as MOOT** plaintiff's motion to strike, ECF No. 30, *see supra* note 7.[23] The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[23] The Court also **STRIKES as DEFICIENT** the government's notice of supplemental authority, ECF No. 46, because there is no provision in the rules for filing a Notice; the government should have filed a Motion for Leave to File.  Regardless, both parties stipulate the government's notice of *22nd Century Technologies* is moot because the Court was already tracking the case.  *See* Tr. at 19:12–20:1.